DAVID HASKELL and SUZANNE HASKELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Haskell v. Commissioner
Docket No. 6446-84.
United States Tax Court
T.C. Memo 1986-341; 1986 Tax Ct. Memo LEXIS 265; 52 T.C.M. (CCH) 15; T.C.M. (RIA) 86341; August 4, 1986. *265 H purchased a 15-minute segment of a 30-minute episode from a 130-episode television series. The offering material stressed tax benefits, contained no income projections, and had a grossly inflated estimate of the value of the segment.At the time of purchase, there had been no market testing of the series, and there was no assurance that such segment would be shown as part of the episode or the series. H paid for such segment with $13,000 in cash and a $52,000 note, recourse in form. Distribution of the segment has produced no revenue. Held: (1) H and W executed valid extensions for the time to assess tax, making the notice of deficiency for 1977 timely; (2) H not entitled to deductions resulting from the purchase and distribution of the segment because such activities were not entered into for profit; (3) for the same reason, H not entitled to investment tax credit for purchase of segment; (4) H and W liable for the addition to tax under sec. 6651(a), I.R.C. 1954, for failure to timely file their return for 1979; and (5) the United States is not entitled to an award of damages under sec. 6673, I.R.C. 1954. William Randolph Klein, for the petitioners. James W. Clark and Lynn C. *266 Washington, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and addition to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6651(a)
Year
Deficiency
[1] I.R.C. 1954 1977
$23,450.31
1979
1,397.00
$350.00
The issues for decision are: (1) Whether, under the provisions of section 6501, the assessment and collection of taxes is barred by the statute of limitations; (2) whether the petitioners are entitled to deductions for losses resulting from the purchase and distribution of a 15-minute segment of a television series; (3) whether the petitioners are entitled to an investment tax credit for purchasing such segment; (4) whether the petitioners are liable for the addition to tax under section 6651(a) for failure to timely file their Federal income tax return for 1979; and (5) whether the United States is entitled to an award of damages under section 6673. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, David and Suzanne Haskell, husband *267 and wife, maintained their legal residence in Elm Grove, Wis., on the date the petition in this case was filed. They filed their joint Federal income tax returns for 1977 and 1979 with the Internal Revenue Service. The time to assess the tax due on the return for 1977 was extended to December 31, 1983, by means of three consents to extend the time to assess tax which were executed by the parties. David Haskell will sometimes be referred to as the petitioner. The petitioner has been a medical doctor specializing in orthopedic surgery since 1972. His specific area of expertise is sports medicine. At the time of trial, he held, among other positions, the post of medical director of the Milwaukee Bucks of the National Basketball Association. He had no special training, education, or experience in the field of television program distribution. However, he was involved in a wife variety of business interests including real estate rental properties, pharmaceutical manufacturing, and oil drilling. The petitioner received and reviewed offering material from Field Planning Corp. (FPC) concerning the television series "Peter Lupus' Body Shop." Such material is approximately 100 pages long, *268 containing a description of the 130-episode series and the tax consequences of owning a 15-minute videotape segment [2] *269 of one such 30-minute episode. The credits of the announcer are said to include numerous small roles in television and motion pictures, the most notable being the fight announcer in the movie "Rocky." The producer is listed as being a three time Emmy Award winner. The material contains no information concerning the past accomplishments of the host, Peter Lupus; nor does the record in this case contain any such evidence. During each eposode, the host performs some exercises and then interviews two guests. Typically, the material states, one guest is an entertainer, such as Jim Backus, and the other is a health or beauty professional. Additionally, viewer mail concerning health and beauty concerns is answered, and an audience member is completely made over by a beauty specialist. One half of the offering material deals with the tax consequences of segment ownership. Included are sections entitled "tax shelter summary" and "tax shelter recap." In the accounting and legal opinion sections, there are extensive discussions of the profit objective requirement for tax benefits and the at-risk rules. On one page is a photocopy of a New York Times article which reports on an IRS crackdown on tax shelter partnerships in, among other areas, motion pictures and master recordings. Hand printed in the margin of such page is the message "our program is for individual investors, not partnerships." The offering material submitted by FPC and reviewed by the petitioner also included a photocopy of the newsletter Brennan Reports and an article copied from Barron's, entitled "Outwitting Uncle Sam." In the tax shelters described in the articles, the participant purchases an entire interest in one episode of a television series; but on the Brennan Reports copy, a handwritten notation identified as an "editors (sic) correction" states that a 15-minute segment is purchased. Such segment is purchased with a 20-percent *270 downpayment and a note, described as fully recourse, equal to 80 percent of the purchase price. However, such note, which has a 10-year term and carries interest at 8 percent per annum, is repayable out of 25 percent of the segment's gross receipts. Brennan Reports says: It is expected that two individual investors involved in the program will each purchase notes of each other from the film seller. Presumably at the maturity of the notes there will be identical balances outstanding and, therefore, neither investor will desire to foreclose upon the other. Instead, they would both be willing to increase the term of the notes for a sufficient number of years to permit payoff through revenues generated by the films. What has happened, in effect, is that fully recourse debt instruments have been converted to non-recourse debt without having violated the at risk provisions of the Tax Reform Act. * * * Additionally, the materials stated that a first-year write-off equal to 400 percent of the downpayment was expected. The Barron's article observes: Even if the deal is questionable, the odds are with the participant. His chance of escaping an audit is excellent. And if the IRS does audit *271 his return, unless the program is an outright sham, the agency at most will disallow a part of his deduction. The matter can then be taken to court for long drawn out litigation. Meanwhile, the investor has received what amounts to an interest-free loan from Uncle Sam. When he pays the deferred taxes, owing to inflation, it will be with cheaper dollars. * * * On September 15, 1977, Four Star Entertainment Corp. (Four Star) and Film Syndicators, Inc. (FSI), entered into an agreement wherein FSI appointed Four Star as its exclusive distributor of the Peter Lupus' Body Shop series throughout the world for 7 years from that date. FSI was to receive 50 percent of the worldwide gross receipts. Conrad Frank was the president of FPC and controlled Four Star and FSI. The summary personal history included in the offering materials states that he was in the life insurance business for 19 years, was a Certified Life Underwriter, and had previously "prepared" 15 films for "potential economic profits as well as tax shelter benefits." The offering material contained a letter to Mr. Frank from Gerald Feifer of Media Marketing Corp. The letter stated that after screening four 30-minute episodes, *272 Mr. Feifer estimated the value of each segment at $65,000. Prior to purchasing the segment, the petitioner read a reprinted article from Taxes-The Tax Magazine entitled "Motion Picture Tax Shelters-A New Approach." Such article contained a detailed explanation of the tax aspects of a scheme substantially the same as the one at issue in this case. Topics discussed in such article included: basis for depreciation, method of depreciation, depreciation recapture, at-risk rules, and investment tax credit. On November 13, 1977, the petitioner and Silver Dollar Video Films, Inc. (Silver Dollar), executed a purchase agreement. Silver Dollar was controlled by Mr. Frank, and he executed the agreement on behalf of Silver Dollar. Under such agreement, Silver Dollar sold all right, title, and interest in a segment of an episode of the series in return for $13,000 in cash and a note from the petitioner for $52,000 at 8-percent interest per annum, due November 13, 1987.He further agreed to enter into a distribution agreement within 30 days. Such distribution agreement was to contain a provision whereby 25 percent of the gross receipts from the segment would be paid each year to Silver Dollar. *273 Such payments were to reduce the unpaid balance of the purchase price. On the same day, the petitioner entered into a 10-year distribution agreement with FSI. FSI was given the exclusive right to distribute, exhibit, rent, market, and otherwise exploit the segment in return for which the petitioner was to receive 50 percent of the gross receipts realized from such activities. However, one-half of the petitioner's share was to be remitted directly by FSI to Silver Dollar until the $52,000 note was satisfied. The rights of FSI could only be assigned with the prior written consent of the petitioner. The segment purchased by the petitioner was from episode 30 and was entitled "Mary Conroy's Defense Against Rape." The petitioner did not view the segment prior to purchase. At the time of his purchase, none of the episodes had been shown on television, and slightly more than half had finished videotaping. The offering materials submitted to and reviewed by the petitioner before he purchased his segment contained very little information concerning the amount of income that could be earned by the segment or how it was to be used.However, testimony at the trial established that the best *274 chance for producing income was by syndicating the segment, as part of the series, on a strip basis. Usually, syndication takes the form of sales on a station-by-station basis. Sales are limited to one station per city because exclusivity of the series within the city must be guaranteed. For this series, stripping would entail showing one episode each day, Monday thru Friday. Mr. Feifer's estimate of value of each segment was questioned by Gary K. Sherman, the regional director of a financial consulting and marketing organization, who wrote to Mr. Frank on behalf of two potential investors. Mr. Sherman was concerned that Mr. Feifer did not answer his telephone, that no one at Media Marketing Corp. had ever heard of him, and that certain advertising professionals felt that such a series would only cost between $5,000 to $12,000 per segment to make. He requested assurance that the price of a segment was reasonable in relation to its fair market value. There is no evidence that such assurance was given. In the fall of 1977, station KECC of El Centro, Cal., agreed to air all 130 episodes at no charge to KECC, except shipping costs. Such showings were to take place during November *275 and December of 1977. The series had gross receipts from distribution of $2,600 in 1978 from station KGUN of Tucson, Ariz. In 1979, Community Home Television, Inc. (Community), of Quezon City, Philippines, contracted to lease 52 episodes for $15,600. Episode number 30 was not included in such episodes. The station KECC agreement was entered into by FSI, and the other two agreements were entered into by Four Star. Mr. Frank, in his capacity as the president of National Film Products, Inc., kept segment owners aware of the income from these agreements. [3]
The petitioner paid Silver Dollar $2,000 for an assignment of the balance due at the due date in 1987 of the $52,000 liability incurred by Gary Sorenson from the purchase of a segment of the series. Such liability arose from Mr. Sorenson's execution of a purchase agreement similar to the one executed by the petitioner. FSI terminated its distribution agreement with Four Star on April 16, 1979. FSI agreed to accept $6,000 from the Community contract in complete satisfaction of all amounts owed to it under the distribution *276 agreement. As a result, segment owners forfeited any right to any additional revenue from the station KGUN agreement. The petitioners reported gross income of $290,856 for 1977 and $430,465 for 1979 and partnership losses of $65,682 for 1977 and $122,319 for 1979. They also reported a $145,884 loss from rental property and a $34,179 farm loss for 1979. They claimed Schedule C losses associated with the segment of the series of $39,000 for 1977 and $3,250 for 1979. In 1977, they reported no income from the segment and claimed depreciation of $39,000, representing 60 percent of its purported value, under the "sliding scale" method of depreciation. Additionally, the petitioners took a $6,500 investment tax credit for the purchase of the segment. For 1979, they reported no income from the segment and $3,250 as a depreciation deduction. In his notice of deficiency dated December 14, 1983, the Commissioner disallowed all credits and deductions arising from the purchase and ownership of the segment of the series and determined that the petitioners were liable for an addition to tax for failure to timely file their return for 1979. Under Rule 72 of the Tax Court Rules of Practice and Procedure, *277 [4] the Commissioner served the petitioners with a timely request for the production of documents relating to the deductions and credits claimed and disallowed on their returns. Later, the Commissioner moved for an order compelling the petitioners to comply with such request and for sanctions in the event that they failed to comply. The Court ordered them to furnish the requested documents. After a hearing on the motion for sanctions, the Court found that the petitioners had not complied with the Court's order to furnish the documents and that there was no just cause for their failure to do so. Accordingly, under Rule 104, the Court ordered that any requested document that had not been made available to the Commissioner could not be offered by the petitioners at trial. At the close of the trial, the Commissioner filed a motion for damages under section 6673 for instituting proceedings before the Tax Court primarily for the purpose of delay or taking a frivolous position. OPINION The first issue for decision is whether, under the provisions of section 6501, the assessment and collection of tax of 1977 is *278 barred by the statute of limitations. In their petition, the petitioners challenged the timeliness of notice for both 1977 and 1979. In their reply to affirmative answers, they conceded timely notice for 1979 and stated that the extensions executed by them for 1977 were induced by the Commissioner's fraud. Section 6501(a) provides the general rule that the Commissioner has 3 years after a taxpayer's return is filed within which to commence statutory proceedings for assessment and collection of tax by the mailing of a notice of deficiency. Section 6501(c)(4) allows the normal 3-year statute of limitations to be extended by agreement between the parties.When the Commissioner relies upon such consent to extend the time to assess tax, he bears the burden of proving the existence of such consent. Bonwit Teller & Co. v. Commissioner,10 B.T.A. 1300 (1928); Farmers Feed Co. v. Commissioner,10 B.T.A. 1069 (1928). However, extensions valid on their face and introduced into evidence satisfy such burden. The petitioner must then show the extensions were invalid. Concrete Engineering Co. v. Commissioner,19 B.T.A. 212, 221 (1930), affd. 58 F.2d 566 (8th Cir. 1932); Rule 142(a). Here the *279 parties stipulated that consents were executed by the parties extending the time for assessment until December 31, 1983, but the petitioners did not address the validity of their extensions at trial or in their briefs. Therefore, we find that the Commissioner's notice of deficiency was timely issued. The second issue for decision is whether the petitioners are entitled to deductions for 1977 and 1979 for losses resulting from their purchase and distribution of a 15-minute segment of episode 30 of the Peter Lupus' Body Works television series. Section 165(a) allows a deduction for any loss sustained during the taxable year that is not compensated for by insurance or otherwise, but section 165(c) limits the deduction allowable to individuals. Section 165(c)(1) allows an individual a deduction for a loss incurred in a trade or business. It is well settled that to constitute a trade or business, the activity must be engaged in with an "actual and honest objective of making a profit." Hirsch v. Commissioner,315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; Green v. Commissioner,83 T.C. 667, 686-687 (1984); Flowers v. Commissioner,80 T.C. 914, 931 (1983); *280 Siegel v. Commissioner,78 T.C. 659, 699 (1982); Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980); Churchman v. Commissioner,68 T.C. 696, 701 (1977); Jasionowski v. commissioner,66 T.C. 312, 319 (1976); Benz v. Commissioner,63 T.C. 375, 383 (1974); Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Although a reasonable expectation of profit is not required, the taxpayer must have the intent and objective of realizing a profit. Hirsch v. Commissioner,315 F.2d at 736; Brannen v. Commissioner,78 T.C. 471, 506 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Dreicer v. Commissioner,78 T.C. at 644-645; sec. 1.183-2(a), Income Tax Regs. "Profit," in this context, means economic profit, independent of tax savings. Beck v. Commissioner,85 T.C. 557 (1985); Herrick v. Commissioner,85 T.C. 237, 254-255 (1985); Surloff v. Commissioner,81 T.C. 210, 233 (1983). *281 The issue of whether a taxpayer engaged in an activity with the requisite intention of making a profit is one of fact to be resolved on the basis of all the facts and circumstances of the case. Hirsch v. Commissioner,315 F.2d at 737; Dreicer v. Commissioner,78 T.C. at 645; Golanty v. Commissioner,72 T.C. at 426; Allen v. Commissioner,72 T.C. at 34; Dunn v. Commissioner,70 T.C. at 720. In making this determination, more weight must be given to the objective facts than to the taxpayer's mere after-the-fact statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Thomas v. Commissioner,84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Churchman v. Commissioner,68 T.C. at 701. The petitioners bear the burden of proving that they possessed the required profits objective. Rule 142(a); see also Boyer v. Commissioner,69 T.C. 521, 537 (1977); Johnson v. Commissioner,59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974); Sabelis v. Commissioner,37 T.C. 1058, 1062 (1962). Section 1.183-2(b), Income Tax Regs., sets forth some of the relevant factors, derived principally from prior case law, which are to be *282 considered in determining whether an activity is engaged in for profit. Boyer v. Commissioner,69 T.C. at 537; Benz v. Commissioner,63 T.C. at 382-383. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Allen v. Commissioner,72 T.C. at 33-34. Dr. Haskell was the petitioners' only witness. His testimony consisted of claims that the purchase and distribution of the segment were motivated by a profit objective. The Court was not persuaded by his testimony which was self-serving and uncorroborated. The Commissioner's only witness was A. Frank Reel, an attorney and an expert in the area of television production *283 and distribution. From 1946 until 1977, he held prominent positions with the American Federation of Television and Radio Artists, Ziv Television Programs, Inc., United Artists Television, Inc., and Metromedia Producers Corporation. At the time of trial, he was associated with a New York City law firm and specialized in entertainment law. He was associated with the syndication and distribution of numerous television series including "Highway Patrol," "Sea Hunt," "Jeopardy," and the "Merv Griffin Show." He is the author of the book, "The Networks-How They Stole the Show," published in 1980 by Charles Scribner's Sons. Such book describes the development of the television industry in the United States from its inception and contains a thorough analysis of the economics of production and distribution in such industry. His testimony was unambiguous and reflected a thorough knowledge of the television industry. The petitioners argue that their purchase and distribution of the segment were activities entered into with the requisite profit objective because there was a remote possibility that a substantial profit would be made. In support of this argument, they contend that the videotapes *284 of the episodes were of good quality and that the host and production crew were reputable television professionals. Additionally, they argue that substantial effort went into the distribution of the series. the Commissioner contends that the petitioners' activities were entirely tax motivated. He cites the substantial tax shelter information provided in the offering material and the unbusinesslike manner in which the activities were conducted. The circumstances surrounding the purchase of the segment clearly indicate that the activity was not engaged in for profit. Approximately one-half of the offering material dealt exclusively with the anticipated tax benefits flowing from such purchase. Excerpts from Barron's, Brennan Reports, and the New York Times clearly stated that the purpose of the scheme was to avoid taxes by circumventing the at-risk provisions of the Code. Barron's noted that the chance of an audit of a participant's income tax return was remote and that, by litigating an adverse determination, the investor received "an interest-free loan from Uncle Sam." The thrust of such materials was that, by executing a purported recourse note (which would never be paid by him) *285 with a face value of $52,000, the petitioner could invest $13,000 in cash and receive the same tax benefits as if he had invested $65,000 in cash. The offering material contains very little information relating to the income potential of the series. There is no information concerning how the series was to be distributed. The only information dealing with the economic value of the segment is the letter from Mr. Feifer. Such letter states that based on screening four episodes it is his opinion that the fair market value of each segment is $65,000. No support is provided for such estimate, and Mr. Feifer's credentials are not listed in the materials. The petitioners did not conduct their affairs in a businesslike manner. Despite investing a large sum of money, purportedly $65,000, the petitioner did not consult with anyone who had knowledge of the television industry. Mr. Sherman suspected that each segment was worth a fraction of its $65,000 price, while Mr. Reel determined a maximum value of $1,125 when shown as part of a 100-or-more episode series. The discrepancy between price and value is so great that, had anyone who had experience in the field and who was not involved in *286 the promotion been consulted, he would have immediately questioned the price of the segment. A person of the petitioner's wide business interests would not overlook such an inquiry if he were engaged in a bona-fide, for-profit activity. In view of the facts that Mr. Feifer could not be located by Mr. Sherman and that he did not work at Media Marketing Corp., the petitioner's contention that he consulted with several people concerning Mr. Feifer's qualifications to make such estimate is not believable. In contrast to such failure to make any inquiry into the value of the segment, the petitioner read an article about tax shelters in addition to the tax information included in the offering material. Clearly, the petitioner was more curious about tax benefits than economic profit. The series was produced and marketed in a very unorthodox manner. According to Mr. Reel, the usual way to produce and market a series such as the one at issue, is to make only a pilot episode and test it in several major markets, such as Chicago, Los Angeles, and New York. If such pilot is successful, additional episodes in the series are then made. This approach minimizes the amount of money invested and *287 tests the market for the series. In this case, all 130 episodes were made without a pilot. Such arrangement was needlessly risky and totally contrary to industry practice. The petitioners provided no explanation for such arrangement. The petitioner received no guarantee that the other segment of episode 30 would be shown with his segment. Similarly, no agreement existed requiring that episode 30 be shown as part of the series. In fact, episode 30 was not part of the Philippine distribution agreement. The petitioners provided no explanation for such oversight, despite Mr. Reel's determination that the segment had no value if it were not distributed with a series of 100 or more episodes. No one connected with the distribution of the petitioner's segment had any expertise in television distribution. Mr. Frank had "prepared" 15 full length movies but was primarily an insurance underwriter. The petitioners presented no evidence establishing his expertise or that of anyone else connected with such distribution. The petitioner was not attentive to the distribution of his segment. In September 1977, FSI named Four Star as its exclusive distributor of the series. Yet, on November 13, *288 1977, Silver Dollar sold the segment to the petitioner, and on the same day, he entered into a distribution agreement with FSI, whose rights were assignable only with his written consent. The revenue-producing agreements for the series were entered into with Four Star, and not FSI, as distributor. It is true that both entities were controlled by Mr. Frank; however, the petitioners' failure to explain this situation leads us to find that the petitioner was not concerned with who distributed the segment. From 1977 through 1979, there was no realistic possibility that the petitioner' segment would appreciate in value. The segment cost the petitioner many times its fair market value. There was no objective evidence that it would ever be worth $65,000. In view of the lack of any agreement that the segment would be shown as part of the series and the absence of a market study, any subjective desires of the petitioner concerning appreciation or income potential were pure fantasy. The purchase and distribution of the petitioner's segment has consistently incurred losses, and there is no indication that this pattern will change. The series, made up of 260 segments, grossed $18,200 as of *289 March 1980, and the petitioners had received nothing. They provided no explanation for such failure, but argue that a change of distributors will improve the economic picture. However, no basis for such optimism was provided. The petitioner's acquisition of Mr. Sorenson's $52,000 liability to Silver Dollar for $2,000 was in keeping with the advertised plan to convert notes, which were fully recourse on their face, to nonrecourse debt. As the scheme is described in the literature, the notes of two investors are sold to each other by Silver Dollar for $2,000 each. Neither investor has an incentive to collect on a note because each holds the note of the other, so that the debts are offsetting.While no evidence was presented that Mr. Sorenson holds the petitioner's debt, the fact that such a scheme is part of the promotion leads us to wonder whether it is held by Mr. Sorenson and causes us to doubt the bona fide nature of the petitioner's debt. The scheme suggests that such debt was intended solely to inflate the tax benefits from the segment ownership by allowing depreciation of the $52,000 represented by the note, even though such amount was never intended to be paid. While it *290 is unnecessary for us to determine whether the sliding scale method of depreciation is the appropriate method of depreciation for the series, we observe that the $39,000 depreciation deduction for 1977 is suspicious. Such amount is three times the petitioner's downpayment; the segment was shown at most once during the 48 days he owned it in 1977; and the segment produced no revenue in 1977. When viewed in the context of this case, the large deduction suggests a pure tax motivation for the segment purchase. The petitioners had gross incomes in 1977 and 1979 which could have resulted in a 70 percent marginal tax rate for each year. Such rate is a strong incentive to engage in tax shelter activities for purely tax motives. Their reporting of large losses in both years from a variety of activities is consistent with the use of tax shelters. This indication of pure tax motive was not addressed by the petitioners. Finally, the petitioners' refusal to make certain documents available to the Commissioner, when combined with the other facts of this case, gives rise to the presumption that if produced the documents would be unfavorable to the petitioners. See Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), *291 affd. 162 F.2d 513 (10th Cir. 1947), and cases cited therein. Based upon the record, it is quite clear that the petitioners have failed to carry their burden of proving that they had the requisite profit objective concerning their purchase and distribution of the segment. Accordingly, the Commissioner's disallowance of the petitioners' claimed losses with respect to the segment is sustained. The next issue for decision is whether the petitioners are entitled to an investment tax credit for purchasing the segment. Section 48(a), as in effect during 1977, limits the availability of the investment tax credit under section 38 to "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life * * * of 3 years or more." Depreciation deductions are allowable only with respect to property which is used in a trade or business or held for the production of income. Sec. 167(a). As we have already discussed, the presence of a profit objective is essential to the existence of a trade or business. Hirsch v. Commissioner,315 F.2d at 736; Brannen v. Commissioner,78 T.C. at 501 and n.7; Hager v. Commissioner, 76 T.C. at 784. Such an *292 objective is obviously required for property to be held for the production of income. See Fox v. Commissioner,80 T.C. at 1006; Mitchell v. Commissioner,47 T.C. 120, 128-129 (1966). We have already determined that the petitioners did not engage in segment-related activities with the intention of making a profit. Consequently, we conclude that the petitioners are not entitled to claim an investment tax credit with respect to the segment. Flowers v. Commissioner,80 T.C. at 931 n. 24; Wildman v. Commissioner,78 T.C. 943, 953-954 (1982); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). [5] The fourth issue for decision is whether the petitioners are liable for an addition to tax under section 6651(a) for failure to timely file their return for 1979. The petitioners have the burden of disproving the Commissioner's determination. Rule 142(a); BJR Corp. v. Commissioner,67 T.C. 111, 130 (1976). Since the petitioners made no effort to introduce evidence concerning this issue, we sustain the *293 Commissioner's determination as to such addition to tax. The final issue for decision is whether the United States is entitled to an award of damages under section 6673 for taxpayer delay or maintenance of a frivolous or groundless position. Such section, as applicable to this case, provides: Whenever it appears to the Tax Court that proceedings before it have been instituted or maintained by the taxpayer primarily for delay or that the taxpayer's position in such proceedings is frivolous or groundless, damages in an amount not in excess of $5,000 shall be awarded to the United States by the Tax Court in its decision. * * * The petitioners failed to produce any objective evidence of a profit objective, and the offering material lists delay of tax payment as a benefit of litigating the validity of this shelter. Such points support a determination that damages are appropriate. However, because of the late notice that such damages would be sought and the previously unlitigated facts of this shelter, [6] we hold that the United States is not entitled to an award of damages under section 6673. Future cases arising from the same or factually similar shelters can expect such damages to *294 be assessed unless they present the Court with objective evidence of an economnic profit objective. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. We observe that the parties have stipulated that the segment was only 10 to 12 minutes long. Such length is somewhat shorter than stated in the offering material. Because a precise determination of the length of the segment is not necessary for our decision, we do not make such determination. The segment will sometimes be referred to as a 15-minute segment.
3. The record does not reveal the relationship of such corporation to the other entities involved in this case.↩
4. Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.↩
5. Cronin v. Commissioner,T.C. Memo. 1985-83; Jaros v. Commissioner,T.C. Memo. 1985-31; Ziegler v. Commissioner,T.C. Memo. 1984-620↩.
6. We observe that in Magin v. Commissioner,T.C. Memo. 1985-304↩, this Court found that an investor's purported purchase of a 15-minute segment of the series was a factual sham because the investor did not gain any rights to the segment. Such case dealt with investor-specific facts, such as the failure to properly execute the purchase and distribution agreements. In the case at hand, the Commissioner did not argue factual sham.