MARQUITA M. ELLEVEN, f.k.a. MARQUITA M. STEELE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Elleven v. Commissioner
Docket No. 25537-90
United States Tax Court
T.C. Memo 1993-145; 1993 Tax Ct. Memo LEXIS 144; 65 T.C.M. (CCH) 2313; April 6, 1993, Filed *144 Decision will be entered for respondent as to the deficiency and for petitioner as to the additions to tax. For petitioner: Lynn Ross, Jr. and John M. Saltarelli. For respondent: Richard D. Ames. SCOTT SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the joint Federal income tax of petitioner and her former husband, Robert J. Steele, for the calendar year 1987 in the amount of $ 88,754 and an addition to tax under section 6653(a)(1)(A)[1] in the amount of $ 4,438 and an addition to tax under section 6653(a)(1)(B) in the amount of 50 percent of the interest attributable to the portion of the underpayment due to negligence. At the trial respondent conceded that the additions to tax were not due by petitioner, and petitioner conceded all the other adjustments in the notice of deficiency, but contended that she was not liable for the deficiency resulting from the adjustments in the notice of deficiency by reason of being an innocent spouse under the provisions of section 6013(e). Therefore, the only issue for decision in this case is whether petitioner has shown that she should be relieved of all or any portion of the deficiency under *145 the provisions of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Granbury, Texas, at the time of the filing of her petition in this case. On March 31, 1962, petitioner and Robert Steele were married. They were divorced on January 8, 1988. Petitioner and Robert Steele filed a joint Federal income tax return, Form 1040, for the calendar year 1987. Quita, Inc., was incorporated under the laws of the State of Texas in 1982. The original shareholders of Quita, Inc., were Robert Steele, petitioner, and Ernest Brewer. Ernest Brewer sold his stock back to Quita, Inc., in 1983 and thereafter until August 1, 1987, Robert Steele and petitioner were the only shareholders of Quita, Inc. Prior to approximately August 1, 1987, petitioner and her former *146 husband owned under the community property laws of the State of Texas 100 percent of the outstanding capital stock of Quita, Inc. After approximately August 1, 1987, petitioner and her former husband owned under the community property laws of the State of Texas 90 percent of the outstanding capital stock of Quita, Inc. During the year in issue and prior thereto Quita, Inc., elected to be taxed under the provisions of subchapter S. For the year in issue Quita, Inc., kept its books and reported its income on a calendar year basis. Initially part of the stock of Quita, Inc., was registered in the name of petitioner and part in the name of her former husband, Robert J. Steele. However, on July 13, 1987, when asked to do so by her then husband, petitioner endorsed her stock certificates in Quita, Inc., and transferred possession of these certificates to her then husband, Robert Steele. Petitioner transferred her capital stock in Quita, Inc., to her former husband pursuant to the divorce decree of January 8, 1988, and in accordance with the provisions of that decree delivered to Robert Steele an irrevocable stock power transferring to him as his sole and separate property any and *147 all right, title, and interest she had in Quita, Inc., whether such shares were registered in the name of Robert Steele or of petitioner. When Quita, Inc., was started in 1982 it was for the purpose of doing credit work for oil companies. Some of the oil companies to which Quita, Inc., rendered services were unable to pay for those services in cash and transferred oil and gas leases to Quita, Inc., in payment for the services. After receiving the various oil and gas leases, Quita, Inc., began acquiring other such leases and finding investors to fund the drilling of oil and gas wells on the leases. Starting sometime in 1986 Mr. Steele spent a high percentage of his time supervising the drilling of oil and gas wells and finding investors to fund this drilling. Petitioner's former husband was president of Quita, Inc., from its inception and prior to approximately August 1, 1987, petitioner was vice president of Quita, Inc. From September 1982 until May 1985 the office of Quita, Inc., was in the home of petitioner and her former husband. When Quita, Inc., was initially formed, Mr. Steele was employed by a different corporation and petitioner worked for Quita, Inc., approximately *148 2 to 3 hours a day as an office manager. At that time, Quita, Inc., had no employees other than petitioner and her former husband. In May 1985, Quita, Inc.'s office was moved from the home of petitioner and her former husband to Las Vegas Trail in Fort Worth, Texas. After the office was moved to Las Vegas Trail, petitioner worked on a full-time basis in the office of Quita, Inc., as office manager. Prior to the middle of 1985, the main function that Mr. Steele performed for Quita, Inc., was traveling to various parts of Colorado, Oklahoma, and east Texas collecting money for different oil companies. He would spend approximately 25 percent of his time in Quita, Inc.'s office and petitioner primarily ran the office. As office manager, petitioner would keep the investor files, handle the checks that went to investors, type prospectuses, and handle any general office work that needed to be done. Both petitioner and Mr. Steele wrote checks on the Quita, Inc., corporate bank account, and both of them signed checks and entered the checks in the check ledger. The corporate books and records were maintained by a Mr. David Fairchild from information which would be given to him either *149 by petitioner or by Mr. Steele. About the middle of 1985 an oil boom began to occur in the area in which Quita, Inc., had oil leases, and the corporation's business increased. About the middle of 1985, because of the increase in Quita, Inc.'s business, it employed two high school girls on a part-time basis to help petitioner with secretarial-type work for Quita, Inc. These two part-time workers were the first employees of Quita, Inc., other than petitioner and her former husband. Petitioner located the two part-time employees and interviewed them and her former husband actually hired them. The Quita, Inc., office was moved to Granbury, Texas, in February 1986. After this move, Quita, Inc., hired two office workers on a full-time basis instead of having the two part-time employees. The two full-time employees did primarily secretarial work and kept up with such things as joint billing interests which was necessary when wells were producing and typed up the contracts connected with these joint interests as well as typing information to be furnished to investors. Prior to employing the two full-time workers in April or May 1986, petitioner had done this type of work for Quita, *150 Inc., without assistance. In September 1986, Quita, Inc., hired Susan Guill to assist in its office. Thereafter, other employees were hired as Quita, Inc.'s business increased, including a young woman who was hired to assist Mr. Steele in selling to investors. Later in 1986 and going into 1987, Quita, Inc., expanded its operations to cover geographical areas other than the areas originally covered. In September or October 1986, petitioner's father moved to Granbury, Texas, and became employed by Quita, Inc. Petitioner's father primarily did bookkeeping work for Quita, Inc. He kept most of the books and records of Quita, Inc., after he became employed there. As additional employees came to work for Quita, Inc., many of the functions previously performed entirely by petitioner were transferred to the other employees. However, petitioner continued to perform services for Quita, Inc., to have signatory authority on Quita, Inc.'s bank accounts, and to draw checks on those accounts for payment of accounts or transfer of funds to another account by Quita, Inc. Some of the checks were signed by petitioner and some by Mr. Steele. In the fall of 1986, petitioner and her former husband *151 purchased three residential lots in Hood County, Texas, on which they planned to build houses: one for petitioner's parents, one for Mr. Steele's parents, and one for petitioner and her former husband. These lots were paid for by Quita, Inc. In order to keep the records with respect to the purchase of the lots and the building of the houses separate from Quita, Inc.'s other accounts, a bank account entitled Marquita M. Steele was opened at the First National Bank of Granbury in which funds were placed by checks drawn on Quita, Inc.'s account. The purpose of this account was to pay for the construction of the houses on the three lots purchased by petitioner and her former husband with funds supplied by Quita, Inc. Another bank account under the name Marquita M. Steele, Building Fund was opened at InterFirst Bank in Cleburne, Texas, with funds supplied by Quita, Inc. The purpose of this account was also to fund construction of the three houses. Although the three houses built on the three lots were built by a general contractor, petitioner selected the decor for the houses and made the numerous decisions that an owner of a house makes with respect to construction of the houses. *152 This took a substantial amount of her time from the latter part of 1986 through the early part of 1987. The first house, the one constructed for petitioner's parents to live in, but which was to continue to be owned by petitioner and her former husband, was finished in early 1987, and petitioner's parents moved into the house. They paid no rent for living in the house. The second house, the one constructed for Mr. Steele's parents, was completed in April or May 1987, and Mr. Steele's parents moved into this house. They paid no rent for this house, which also continued to be owned by petitioner and her former husband. Each of these houses cost around $ 100,000. Construction of the third house was completed sometime in August 1987, and petitioner moved into this house alone, since she and her husband had recently separated. The total cost of this house was approximately $ 225,000. Although in late 1986 and up through the middle of July 1987, petitioner was spending much of her time supervising the construction of the three houses, she remained an officer and employee of Quita, Inc. She continued to sign some checks and do some work in the office, although much of the office *153 work had been taken over by other employees. During the time petitioner was dealing with construction of the houses, she fell from a ladder and broke her leg and was in a cast for some weeks. However, she continued supervising the construction of the houses. When petitioner was in the office of Quita, Inc., during the first 6 months of 1987, she felt that her former husband was not including her in the business decisions to the same extent he previously had included her. She was not surprised in the middle of July 1987, when he told her that he wanted a divorce. He also told petitioner that he wanted her to turn over all of her stock in Quita, Inc., to him. When she met with him at a predesignated location he had numerous documents which he requested her to sign. She did sign these documents. Part of the documents she signed was an endorsement to him of her stock in Quita, Inc. In July and August petitioner's health was affected by her problems. She had headaches and depression and even consulted a psychotherapist at the suggestion of her doctor. After endorsing the stock certificates in Quita, Inc., to her husband, on July 13, 1987, and turning these certificates over to *154 him, petitioner did not participate in the affairs of Quita, Inc. In connection with the divorce proceedings, her attorney advised her that under the community property laws of Texas she still had an interest in the stock of Quita, Inc. Therefore, in the agreed settlement approved in the divorce decree of January 8, 1988, petitioner agreed to transfer her stock interest consisting of 5,000 shares in Quita, Inc., to her former husband and to sign an irrevocable stock power transferring to Robert J. Steele as his sole and separate property all of her interest in Quita, Inc., whether such shares were registered in the name of Robert J. Steele or Marquita M. Steele. In exchange for petitioner's community property interest in Quita, Inc., Robert J. Steele agreed to pay for her benefit $ 177,500. He was to deliver to petitioner a cashier's check in the amount of $ 25,000 and execute a promissory note in the amount of $ 152,000 secured by certain real property which was transferred to him by the divorce decree. All Robert J. Steele ever paid to petitioner on the note was $ 4,500. Pursuant to the divorce decree, in addition to the stock in Quita, Inc., Mr. Steele was to receive certain *155 real property owned by the parties, and petitioner received a warranty deed and sole title to the house which had been constructed for her parents to live in and the house which had been constructed to be the home of her and her former husband. She also received the stock in a corporation known as Bluebonnet Petroleum, Inc., certain oil leases which produce about $ 600 a year in income, certain insurance policies, and a 1985 Caprice automobile. The divorce decree provided that petitioner would file a joint Federal income tax return for the year 1987 with her former husband and that Robert J. Steele would be responsible for all Federal taxes owed or which might become due by him or by petitioner for 1987 and all prior years. The 1987 joint Federal income tax return of petitioner and her former husband was prepared by an accountant, Mr. Curtis Ortloff. After the return was prepared, it was sent to petitioner to be signed. Petitioner took the return to her own accountant, Mr. Stanley McBroom, for review. Mr. McBroom asked for certain records of Quita, Inc., but never was furnished with all of the records he asked for by either Mr. Steele or Mr. Ortloff. However, after looking *156 over the 1987 return, he advised petitioner to sign the return. Petitioner was also sent a proposal to split into two parts the 1987 tax year of Quita, Inc., for the purpose of filing the corporate income tax return, Form 1120S. On the advice of Mr. McBroom, petitioner did not sign the agreement to split the year and the return prepared splitting the year into two parts was not filed. Mr. McBroom's advice was based on his review of the proposed 1120S from which he concluded that if the year were split into two parts, the income would go primarily into the first half of the year, during which petitioner had stock recorded in her name, and most of the losses into the latter half of that year. A Form 1120S was filed for Quita, Inc., for the year 1987 on a calendar-year basis. In early 1990 this Form 1120S along with the joint Federal income tax return, Form 1040, filed by petitioner and her former husband was the subject of an investigation by an internal revenue agent. During this investigation, petitioner's accountant, Mr. McBroom, met with the revenue agent. In these meetings the nature of the adjustments to be made to the income as reported on the Federal income tax return *157 of petitioner and her former husband was discussed. The changes came primarily from changes on Quita, Inc.'s Form 1120S and from an adjustment to the basis petitioner and her former husband had in their Quita, Inc., stock. The adjustment discussed by Mr. McBroom on behalf of petitioner with the revenue agent was his proposed disallowance of the net operating loss claimed by petitioner and her former husband from a net operating loss carryover of Quita, Inc., as shown on the Form 1120S filed by Quita, Inc. The revenue agent took the position that there was no basis to the shareholders in their Quita, Inc., stock as of the beginning of 1987. The revenue agent's determination of a lack of basis to the shareholders in the Quita, Inc., stock resulted in the disallowance as a carrythrough to the shareholders of a claimed net operating loss carryover of the corporation. The revenue agent proposed a determination of a capital gain to the shareholders from distributions from Quita, Inc., in excess of their basis in their Quita, Inc., stock. The revenue agent also proposed to determine salaries to petitioner and her former husband from Quita, Inc. There were also other small accounting-related *158 adjustments. The Federal income tax return as filed by petitioner and her former husband had shown a substantial basis in their Quita, Inc., stock at the beginning of 1987 and in fact after deduction of the net operating loss showed some basis still available. In order to determine the correctness of the revenue agent's adjustments of the basis of the Quita, Inc., stock to petitioner and her former husband, Mr. McBroom would have needed the records of Quita, Inc., for prior years in order to check the basis each year of petitioner and her former husband in their Quita, Inc., stock and the amount of basis each year used because of losses reported by petitioner and her former husband from Quita, Inc. Mr. McBroom could have done the same work as the revenue agent if the corporate records from the inception of the corporation to the beginning of 1987 had been available to him. He would have needed the records of earlier years in addition to the 1987 general ledger of Quita, Inc., bank statements of Quita, Inc., and reconciliations and similar items. Mr. McBroom did not have all of this information to personally check the computations made by the revenue agent in his proposed adjustments. *159 The following adjustments were made in the notice of deficiency issued to petitioner and her former husband for the year 1987: a.
Sch. E - Intangible Drilling Cost
$ (1,219.00)
b.
Sch. E - Depletion
(1,115.00)
c.
Sch. E - S Corporation
(124,699.00)
d.
Interest Income
6,391.00 e.
Salary from Quita Inc.
96,432.00 f.
From 4797
(1,746.00)
g.
Carryover Net Operating Loss
196,710.00 h.
Itemized Deductions
(432.00)
i.
Capital Gain Income
126,036.00 The salary from Quita, Inc., of $ 96,432 was allocated $ 90,432 to Mr. Steele and $ 6,000 to petitioner. Quita, Inc.'s, distributable ordinary income to Mr. Steele and petitioner was reduced in 1987 by the $ 96,432 of salary determined. Neither petitioner nor Mr. Steele had reported salary income from Quita, Inc., on their 1987 Federal income tax return. The disallowance of a net operating loss carryover of $ 196,710 resulted from the determination that all of petitioner's and Mr. Steele's basis in their Quita, Inc., stock had been consumed with losses in years prior to 1987. The capital gain income of $ 126,036 was a result of the determination of distributions to petitioner and her former husband from Quita, Inc., *160 in 1987 in excess of their basis in their Quita, Inc., stock. The reduction of S corporation income by $ 124,699 (item c. above) resulted from certain adjustments made to the distributable income and deductions from Quita, Inc., to petitioner and her former husband resulting from adjustments made to Quita, Inc.'s income. The adjustments to Quita, Inc.'s income and the basis of petitioner and her former husband in Quita, Inc.'s stock were largely technical adjustments made from the records of Quita, Inc., and the records of petitioner and her former husband. A copy of the report of the revenue agent showing the adjustments was sent to Mr. McBroom under the provisions of his power of attorney on file with the Internal Revenue Service. The explanation of items attached to the report sent to Mr. McBroom showed with respect to each adjustment that "taxpayers were in agreement with" the adjustment but due to the "Innocent Spouse Question" an agreement could not be secured from the taxpayers. OPINION Section 6013(e)[2] provides that where taxpayers have: (1) Filed a joint return for the taxable year, (2) on such return there is a substantial understatement attributable to grossly erroneous *161 items of one spouse, (3) the other spouse establishes that in signing the return he or she did not know or have reason to know that there was such substantial understatement, and (4) taking into account all of the facts and circumstances it is inequitable to hold the other spouse liable for the deficiency in tax, the other spouse shall be relieved of such tax. Grossly erroneous items are defined to mean, with respect to any spouse, an item of income attributable to such spouse which is omitted from gross income and any claim of deduction, credit, or basis by such spouse for which there is no basis in fact or law. A substantial understatement is defined to mean any understatement that exceeds $ 500. *162 In this case it is clear that petitioner and her former husband filed a joint return for the calendar year 1987. Also the record is clear that the return contained substantial understatements of tax. Both parties agreed to the presence of these two factors. However, they are in disagreement with respect to the other items required to establish relief under the provisions of section 6013(e). Petitioner takes the position that all of the adjustments represent grossly erroneous items attributable to petitioner's former husband and that petitioner, in signing the return, did not know and had no reason to know of the substantial understatement resulting from these grossly erroneous items. Petitioner also contends that it would be inequitable to hold her liable for the tax. Petitioner argues that the items resulting in the deficiencies are all allocable to her former husband except for the community property laws of the State of Texas. She argues that "For purposes of this subsection, the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws." Petitioner states that *163 under this provision the items were all items of her former husband. Petitioner contends that although half of the stock of Quita, Inc., was registered in her name until mid-July 1987 and all of the stock was equally divisible between petitioner and her former husband because of the community property laws of Texas, the business of Quita, Inc., was in fact the business of her former husband. Since most of the items resulted from adjustments in connection with Quita, Inc., it is petitioner's position that all adjustments should be considered adjustments with respect to her former husband. Respondent takes the position that since the items were items that resulted from constructive distributions from an S corporation in which petitioner had one-half of the stock registered in her name until July 13, 1987, and owned one-half for the remainder of 1987 under Texas community property laws, the adjustments are equally hers and her former husband's. Respondent contends that for this reason the adjustments are not grossly erroneous items of petitioner's former husband. While respondent does not specifically contend that in signing the return petitioner knew of the grossly erroneous items, *164 he does contend that from her participation in the corporation, particularly in connection with the keeping of records, she had as much reason to know of the incorrect computation of basis of the Quita, Inc., stock as did her former husband. While respondent does not contend that either petitioner or Mr. Steele actually knew the accountants had erroneously computed their basis in the Quita, Inc., stock, it is respondent's position that they were in an equal position with respect to their knowledge in that both had the equal opportunity to know of this incorrect computation of stock basis. Petitioner makes much of the fact that during most of 1987 she was not as active in the actual affairs of Quita, Inc., as she had previously been, and after July 13, 1987, she was not at all active. Respondent points out that the adjustments that gave rise to the improper deductions and failure to report income here with respect to Quita, Inc., had all arisen in years prior to 1987 so that there was no basis in the Quita, Inc., stock left in 1987. The parties had on their return reported distributable income from Quita, Inc., but it had been offset by loss carryovers and other items which arose *165 from incorrect computations in prior years. It is respondent's position that in all of these prior years petitioner was equally knowledgeable about the recordkeeping and the affairs of Quita, Inc., as her former husband and in some ways with respect to records, more knowledgeable. Although respondent's position is that petitioner was reasonably active in the affairs of Quita, Inc., up to July 13, 1987, he contends that knowledge of the items that caused the understatements in this case would come from prior years where, with respect to the recordkeeping, petitioner was more active in the affairs of Quita, Inc., than her former husband. Respondent further argues that considering all of the circumstances here and particularly the property distributed in the divorce to petitioner that had been paid for with corporate funds, it is not inequitable to hold petitioner liable for the tax. Respondent also contends that the items here which involve deductions such as the disallowed net operating loss carryover deduction and certain other items have not been shown by petitioner to be grossly erroneous items under the definition contained in section 6013(e)(2)(B). Respondent states that *166 petitioner has failed to show what caused the change in basis of the stock she and her former husband held in Quita, Inc. Respondent contends that having failed to show how the adjustments to basis were made, petitioner has not shown that there is no basis in fact or law for the manner in which these items were claimed on the joint return for 1987 filed by petitioner and her former husband. Petitioner contends that the testimony of respondent's revenue agent with respect to the technicality of the adjustments he made is sufficient to show that there was no basis in fact or law for the manner in which these adjustments were claimed on the joint return filed by petitioner and her former husband. Respondent argues that here the major adjustments were in connection with an S corporation in which up to July 13, 1987, half the stock was registered in petitioner's name and half in her former husband's name. After that date and throughout the remainder of 1987 petitioner on a community property basis owned approximately half the stock of Quita, Inc. As respondent points out, if petitioner had filed a separate return she would have been required to report half the distributions and other *167 items connected with Quita, Inc., and her former husband the other half. Therefore, unless the provisions of section 6013(e)(5) apply here, the items that caused the understatement are equally those of petitioner and her former husband. There are very few cases dealing with the interpretation of section 6013(e)(5). In Allen v. Commissioner, 514 F.2d 908, 912-913 (5th Cir. 1975), affg. in part and revg. in part and remanding 61 T.C. 125 (1973), the Court stated in regard to the interpretation of section 6013(e)(5): Community property laws are disregarded under section 6013(e)(2)(A), except for "income from property;" therefore, Mrs. Allen had to show that it was not "income from property" to avoid the attribution, for tax purposes, of half of the omitted income by operation of New Mexico's community property law. Mrs. Allen bases her argument that the rents, distributions, and gain on transfer of assets were not income from property on a contention that the legislative history of section 6013(e) reveals a congressional intent to disregard community property laws when the omitted income is generated by business activities *168 which require the rendering of substantial services by one spouse; and she contends the grain business required Lewis' services. * * * We agree with the Tax Court that where omitted income is generated by the performance of substantial services by one spouse, that income should be attributed to that spouse for purposes of section 6013(e)(1). [Fn. ref. omitted.] Here, the most substantial adjustment was an adjustment in basis to stock. Section 6013(e)(5) refers to items of gross income. At the time Allen v. Commissioner, supra, was decided, section 6013(e) only relieved a spouse from omitted income of the other spouse. Although now section 6013(e) applies to erroneous deductions or basis, section 6013(e)(5) has not been amended to include these items as well as income. Even more important is the fact that Quita, Inc.'s income was generated by services of both Mr. Steele and petitioner. Compare Bokum v. Commissioner, 94 T.C. 126, 140-146 (1990). In the beginning years when Mr. Steele was employed by another corporation probably Mrs. Steele's services generated more of the income of Quita, Inc., than did Mr. *169 Steele's. In later years the work Mr. Steele did was probably more responsible for the generation of income of Quita, Inc. However, Mrs. Steele's services were partially responsible. Even in the year 1987 when Mrs. Steele was spending a substantial amount of time in connection with the building of the houses that were built to be owned by her and her former husband with funds from Quita, Inc., she rendered some services to Quita, Inc. The allocation of salary as shown in the adjustment made in the notice of deficiency was a little over $ 90,000 to petitioner's former husband and approximately $ 6,000 to petitioner. However, there is no showing of the relative value of the services to Quita, Inc., by petitioner and her former husband in the year 1987 other than the salary allocation made in the revenue agent's report which formed the basis of the notice of deficiency and there is no showing of any kind of the relative value in other years to the corporation of services of petitioner and her former husband. It was during these other years that the adjustments here involved arose. There is nothing in this record to enable us to make an allocation of the relative value of the services *170 of petitioner and her former husband to Quita, Inc., in years prior to 1987. If the relative value is important as petitioner contends, she has failed to prove a necessary fact. The burden of showing that she has satisfied each of the statutory requirements of section 6013(e) is on petitioner. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Sonnenborn v. Commissioner, 57 T.C. 373, 381-383 (1971). Since petitioner has failed to show that the items which she claimed were attributable to her former husband were in fact attributable to him rather than to both of them, she has failed to show that she satisfies the provisions of the statute that require the items to be those of the other spouse. The record does show that the salary adjustment in the notice of deficiency allocated over $ 90,000 to petitioner's former spouse and only $ 6,000 to petitioner for 1987. However, petitioner not only reviewed this joint *171 return herself before signing it, but took it to her accountant for review. Petitioner knew that both she and her former husband had rendered services to Quita, Inc., in 1987. She also knew that the return as filed showed no salary for either her or her former husband from Quita, Inc. Her only lack of knowledge in this respect was that a part of their receipts from Quita, Inc., in 1987 should have been as salary with a deduction of the amount by Quita, Inc., thereby reducing Quita, Inc.'s distributable income. Petitioner of course knew that Quita, Inc., had actually distributed amounts to her and her former husband in 1987 through payment for construction of houses owned by them. The type of lack of knowledge petitioner had with respect to salaries is not the type contemplated by section 6013(e). See Purcell v. Commissioner, 86 T.C. 228 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Most of the items here involved are items of deduction and all of them even including the salary item previously discussed arise directly or indirectly out of a basis adjustment. An omission of income is considered a grossly erroneous item. *172 However, in order for a deduction or basis claimed to be grossly erroneous the statute requires that there be a showing that there is no basis in fact or law for the claimed deduction or basis computation. The adjustments here made to the basis of the stock of petitioner and her former husband by the revenue agent went back to the inception of the corporation. Although not specifically shown in the record, it is reasonably clear that neither petitioner nor her former husband knew precisely how the basis of their stock in Quita, Inc., had been determined by the various accountants who prepared their tax returns or Mr. Fairchild who had done whatever bookkeeping petitioner did not do for most of the years prior to 1987. Since there is no showing as to how basis had been computed on the various returns and the revenue agent's explanation of the adjustments is that they were technical adjustments, petitioner has failed to show that there was not basis in fact or law for the basis as computed on the return as filed. Since it was the computation of this basis that gave rise to most of the adjustments, petitioner has failed to show that these items were grossly erroneous items. In some *173 cases it has been stated that to show that a deduction has no basis, the deduction must be frivolous, fraudulent, or phony, Douglas v. Commissioner, 86 T.C. 758, 763 (1986). The evidence here shows that petitioner's accountant, Mr. McBroom, was not alerted by anything on the 1987 return that there was an error in the basis of the Quita, Inc., stock as shown on the return. Apparently the accountant who prepared the 1987 return, Mr. Ortloff, was unaware of any problem also. Mr. Ortloff was not called to testify to explain how he computed the basis in the stock at the beginning of 1987. From other testimony in the record, it appears it was done from amounts shown on prior returns. It could be that there was a basis in either fact or law for the method used on the joint return by petitioner and her former husband. Certainly there has been no showing here that there was no basis in fact or law for the way the basis of the Quita, Inc., stock was computed on the 1987 return of petitioner and her former husband. For this reason also petitioner has failed to show that she is entitled to be relieved from tax under the provisions of 6013(e). See Stevens v. Commissioner, supra; *174 Purcell v. Commissioner, supra; Bokum v. Commissioner, 94 T.C. 126, 142 (1990). Since we conclude that petitioner has failed to show that the items she claimed to be grossly erroneous items were in fact items of her former husband and has also failed to show that the items were grossly erroneous within the meaning of the statute, we conclude that she has failed to establish that she is entitled to relief under section 6013(e). We need not discuss further the arguments made by respondent that even if petitioner did not know of the errors in the joint 1987 return, she had the same reason to know as her former husband had to know of these errors. We therefore will not consider respondent's argument that it was not the intent of section 6013(e) that the person claiming to be an innocent spouse prevail where neither spouse knew of the grossly erroneous items reported on the return. We do not need to discuss respondent's contention that because of petitioner's activity in the corporation from its inception through the middle of 1987 and because of the property paid for by the corporation that was awarded to her under the divorce decree, it would *175 not be inequitable to deny her relief under section 6013(e). Much of petitioner's argument goes to the fact that her former husband has not performed his part of the agreement incorporated in the divorce decree of paying her for the stock of Quita, Inc., which she transferred to him or of paying the income tax based on their joint return for 1987 as he was required to do by the divorce decree. None of these facts would bear on the application of the provisions of section 6013(e) to petitioner with the possible exception of the issue of whether it would be inequitable to hold petitioner liable for the tax. We did not decide in this case whether it would be inequitable to hold petitioner liable for the tax since she has failed to prove other necessary elements for the application of section 6013(e). Decision will be entered for respondent as to the deficiency and for petitioner as to the additions to tax. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Sec. 6013(e): (e) SPOUSE RELIEVED OF LIABILITY IN CERTAIN CASES. -- (1) IN GENERAL. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement. (2) GROSSLY ERRONEOUS ITEMS. -- For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse -- (A) any item of gross income attributable to such spouse which is omitted from gross income, and (B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law. * * * (5) SPECIAL RULE FOR COMMUNITY PROPERTY INCOME. -- For purposes of this subsection, the determination of the spouse to whom items of gross income (other than gross income from property) are attributable shall be made without regard to community property laws.↩