GERARD M. STURM AND ELIZABETH STURM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sturm v. Commissioner
Docket No. 29058-82
United States Tax Court
T.C. Memo 1993-172; 1993 Tax Ct. Memo LEXIS 173; 65 T.C.M. (CCH) 2447; April 19, 1993, Filed *173 Elizabeth Sturm, a.k.a. Elizabeth Joyner, pro se. For respondent: Laurie B. Kazenoff. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined deficiencies in petitioners' joint Federal income taxes in the amounts of $ 5,680 for 1979 and $ 9,897 for 1980. After various concessions, the sole issue for decision is whether petitioner Elizabeth Sturm (petitioner) qualifies for relief from liability as an innocent spouse under section 6013(e). [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner and her former husband, Gerard M. Sturm, were residents of Lorton, Virginia. In 1952, Mr. Sturm received a commission as an ensign in the U.S. Navy. On August 20, 1955, petitioner and Mr. Sturm were married. Prior to the *174 marriage, petitioner worked as a dental assistant. For approximately 1 year after the marriage, petitioner worked as a dance instructor. Petitioner and Mr. Sturm had three children, born in 1956, 1958, and 1959. Between 1956 and 1972, Mr. Sturm's naval career included overseas cruises which would last between 6 months to in excess of 1 year. During Mr. Sturm's absences, petitioner would make family purchases and balance the family checkbook. Petitioner, however, was totally dependent on Mr. Sturm for her financial support, and petitioner did not work outside of the home until 1979, after all of the children went to college. After 1972, when Mr. Sturm transferred to shore duty at the Pentagon, Mr. Sturm controlled all family finances. Petitioner would purchase food, clothing, and gasoline with funds made available by Mr. Sturm for that purpose. Mr. Sturm's paycheck and other funds or savings were maintained in a separate bank account which Mr. Sturm alone controlled. On October 11, 1978, Mr. Sturm obtained a home-equity loan in the amount of $ 29,000. Petitioner signed the loan application with the understanding that the loan proceeds would be used for debt consolidation and *175 for educational expenses of the children. In the late 1970's, petitioner and Mr. Sturm were experiencing marital problems and personal difficulties. Mr. Sturm had an alcohol problem. Petitioner was undergoing chemotherapy for the treatment of cancer. In 1979, petitioner obtained part-time clerical employment outside the home. In anticipation of his retirement from the Navy, Mr. Sturm became very interested in investments. In late 1979, Mr. Sturm discussed with a Mr. Robert Agnew various tax-oriented investments that Mr. Agnew was promoting. Mr. Sturm spoke with Mr. Agnew at length about two limited partnerships, including Bravo Productions, Inc. (Bravo). At a meeting in the Sturms' home, Mr. Agnew presented to Mr. Sturm and to neighbors of the Sturms information about the limited partnerships. Petitioner did not participate in the discussions concerning the investments, and petitioner was only present in the room where the meeting was held for the purpose of serving refreshments. Without consulting petitioner, Mr. Sturm decided to invest in Bravo. Mr. Sturm signed the paperwork relating to the investment, and, using money from the home-equity loan, Mr. Sturm gave Mr. Agnew *176 a check for $ 10,000. Petitioner was not aware of Mr. Sturm's investment in Bravo, of the amount invested, or of any of the purported tax benefits associated with the investment. On April 15, 1980, and on July 22, 1981, Mr. Sturm presented petitioner with completed joint Federal income tax returns for 1979 and 1980, respectively. As was their custom, Mr. Sturm indicated to petitioner where she was to sign, and petitioner signed the returns without reviewing them. In 1980 and 1981, Mr. Sturm received from respondent refund checks of $ 6,258 and $ 592 relating to the 1979 and 1980 tax returns he and petitioner had filed. Mr. Sturm did not inform petitioner of the refunds. He deposited the refunds into the checking account which he controlled. The Sturms' modest lifestyle did not change in any significant way in 1980 or 1981. During 1980 and 1981, petitioner's treatment for cancer continued, including a radical mastectomy, radiation treatment, and chemotherapy. In 1984, Mr. Sturm filed for divorce. During discovery in the divorce proceedings, petitioner learned, for the first time, that Mr. Sturm had invested in Bravo. On February 6, 1986, the Virginia Circuit Court for the *177 County of Fairfax (Circuit Court) issued a divorce decree terminating the marriage of petitioner and Mr. Sturm. On January 14, 1987, the Circuit Court entered an order providing that "any tax liability pertaining to * * * the Bravo, Inc. investment should be borne by [Mr. Sturm] alone, because these investments were solely at the instigation of [Mr. Sturm] and were taken at his discretion". Sturm v. Sturm, Chancery No. 88682 (Va. Cir. Ct., Fairfax Cty., Jan. 14, 1987). On April 3, 1987, we entered a stipulated decision which held both Mr. Sturm and petitioner liable for the tax deficiencies attributable to the Bravo-related deductions. Mr. Sturm forged petitioner's name to the stipulated decision. Mr. Sturm did not consult with petitioner regarding the stipulated decision, and Mr. Sturm had no authority to act on petitioner's behalf. On August 14, 1987, the Circuit Court awarded the family residence to petitioner and ordered petitioner to purchase Mr. Sturm's interest in the residence. Sturm v. Sturm, Chancery No. 88682 (Va. Cir. Ct., Fairfax Cty., Aug. 14, 1987). After refinancing the residence, petitioner paid $ 34,000 to Mr. Sturm for that purpose. Mr. Sturm did *178 not apply any of the $ 34,000 received from petitioner to the joint Federal income tax liabilities relating to 1979 and 1980. On June 2, 1989, counsel for petitioner filed a motion for leave to file a motion to vacate the stipulated decision that in 1987 had been entered in this case. On October 24, 1989, we granted petitioner's motion for leave to file a motion to vacate the stipulated decision, and we vacated the stipulated decision. Petitioner does not contest the amount of the deficiencies and the additions to tax. She only asserts her nonliability therefor as an innocent spouse. OPINION As a general rule, when a married couple files a joint Federal income tax return, each spouse is jointly and severally liable for the amount of tax due. Sec. 6013(d)(3); Bokum v. Commissioner, 94 T.C. 126, 137 (1990) (Court reviewed). Under section 6013(e)(1), however, a spouse may qualify as an innocent spouse and be relieved from such joint and several liability if the following requirements, among others, are satisfied: (1) There is on such return a substantial understatement of tax relating to grossly erroneous items attributable to the other spouse; *179 (2) the spouse did not know, and had no reason to know, that there was a substantial understatement of tax on the return; and (3) taking into account all the facts and circumstances, it would be inequitable to hold the spouse liable for the deficiency attributable to the substantial understatement. The alleged innocent spouse has the burden to prove that each of the statutory requirements is satisfied. Rule 142(a); Clevenger v. Commissioner, 826 F.2d 1379, 1382 (4th Cir. 1987), affg. T.C. Memo. 1986-149; Bokum v. Commissioner, supra at 138. In enacting section 6013(e), however, Congress intended to remedy a perceived injustice, and we "should not hinder that praiseworthy intent by giving the exception an unduly narrow or restrictive reading." Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975) (fn. ref. omitted). An understatement is not attributable to the spouse claiming innocent spouse status if he or she was not involved in the activity giving rise to the understatement. See Bokum v. Commissioner, supra at 140-141; *180 Bell v. Commissioner, T.C. Memo. 1989-107. Whether an alleged innocent spouse, in signing a joint return, knew, or had reason to know, of an understatement of tax liability is a question of fact. Clevenger v. Commissioner, supra at 1382; Shea v. Commissioner, 780 F.2d 561, 565-566 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310. A spouse would have reason to know of an understatement if a reasonably prudent person under the circumstances at the time of signing and filing the tax return would have either known of the understatement or would have inquired as to whether or not there was an understatement. See Stevens v. Commissioner, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Sanders v. United States, supra at 166; Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979); Mysse v. Commissioner, 57 T.C. 680, 698-699 (1972). Factors relevant to the determination of whether *181 a spouse had reason to know of the understatement include the spouse's level of education and involvement in family financial matters, the presence of unusual or lavish expenditures during the years in issue, and the other spouse's evasiveness and deceit with regard to the family finances. Stevens v. Commissioner, supra at 1505, and cases cited therein. Whether it is inequitable to hold a spouse liable for the deficiency in tax is to be determined on the basis of all the facts and circumstances. Sec. 6013(e)(1)(D); sec. 1.6013-5(b), Income Tax Regs. Relevant factors in that analysis include: (1) Whether the spouse claiming relief significantly benefited from the understatement, Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989), and (2) whether the spouse claiming relief has been deserted by, or divorced or separated from, the other spouse, sec. 1.6013-5(b), Income Tax Regs. Normal support is not a significant "benefit" for purposes of analyzing the equity of granting innocent-spouse relief. Estate of Krock v. Commissioner, supra at 678; Purcell v. Commissioner, 86 T.C. 228, 242 (1986), *182 affd. 826 F.2d 470 (6th Cir. 1987); sec. 1.6013-5(b), Income Tax Regs.
Respondent contends that the substantial understatements of tax attributable to the grossly erroneous Bravo-related deductions are attributable to petitioner as well as to Mr. Sturm, that petitioner either knew or had reason to know of the understatements attributable to the Bravo-related deductions, and that it would not be inequitable to hold petitioner liable for the deficiencies under the facts and circumstances of this case. We disagree. The evidence establishes that petitioner was not involved in the Bravo investment. Petitioner did not sign the Bravo investment documents, and the investment is not attributable to petitioner. Mr. Sturm made the Bravo investment with money from the home-equity loan without disclosing to or discussing with petitioner the investment. Mr. Sturm's and Mr. Agnew's testimony that petitioner was privy to the investment was not credible. Petitioner did not have actual knowledge of the Bravo deductions or of the understatements attributable thereto. Further, at the time petitioner signed the 1979 and 1980 joint Federal income tax returns, she did *183 not have reason to know of the understatements. Mr. Sturm controlled the finances of the family. No unusual expenditures were made (other than Mr. Sturm's investment in Bravo), and Mr. Sturm did not disclose to petitioner his investment in Bravo. Because petitioner was dependent upon Mr. Sturm for her support, she may have received some benefit from the tax refunds which were sent to Mr. Sturm and which were attributable to the understatement. Such benefit, however, did not exceed normal support. Under the facts and circumstances of this case, it would be inequitable to hold petitioner liable for the deficiencies in tax attributable to the Bravo investment. Having met the requirements provided in section 6013(e), petitioner is entitled to treatment as an innocent spouse. To reflect the foregoing, An appropriate order and decision will be entered. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩