**Donald FELDMAN and Patricia Feldman, a/k/a Patsy Jane Feldman, Petitioners–Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 93–4519.

United States Court of Appeals, Eleventh Circuit.

May 17, 1994.

could equally be subject to hostility based upon other reports.

Donald Feldman, pro se.

Gary R. Allen, Chief, Paula K. Speck, Jonathan S. Cohen, Appellate Section, Tax Div., Dept. of Justice, Washington, DC, for appellee.

Before TJOFLAT, Chief Judge, DUBINA, Circuit Judge, and RONEY, Senior Circuit Judge.

DUBINA, Circuit Judge:

This appeal concerns a notice of deficiency disallowing deductions arising out of appellants' ("the Feldmans") investments in three tax shelter limited partnerships. The Feldmans, husband and wife, do not contest the merits of these deficiencies and penalties, but argue that they are barred by the statute of limitations and that Patricia Feldman should receive innocent spouse relief under 26 U.S.C. § 6013(e).[1] The Tax Court found the Feldmans' contentions to be without merit. Because we agree with the Tax Court's findings, we affirm the judgment.

## I. STATEMENT OF THE FACTS AND PROCEDURAL HISTORY

The Feldmans lived at all relevant times in Florida. Since 1960, Donald Feldman practiced law. Patricia Feldman, during most of the years at issue, occasionally worked as an insurance "advisor" for her husband's law firm and spent the remainder of her time doing volunteer work. She wrote most of the checks on the family's joint bank account and compiled most of the data for the joint tax returns that she and her husband filed for 1974 through 1980, the years at issue, and reviewed the returns before they were filed.

In 1974, Donald Feldman and his law partner, John Abramson, ("Abramson") invested in a limited partnership known as Essex Associates ("Essex"). Essex purported to lease data processing and other equipment. On their 1974, 1975, 1976, and 1977 tax returns, the Feldmans claimed a distributive share of Essex partnership losses of $64,587, $9,725, $11,018, and $803, respectively; on their 1977, 1978, and 1979 tax returns, the Feldmans claimed interest expenses of $10,647, $1,074, and $950, respectively.

Donald Feldman and Abramson invested in another limited partnership, Cambridge Associates ("Cambridge") in 1974. Cambridge purportedly owned the distribution rights to "Dirty Money," a motion picture produced in France in 1972. The Feldmans claimed distributable losses of $27,459, $43,850, $351, $375, $270, $296, and $210 for Cambridge on their tax returns for 1974–1980. The general partner of Cambridge was Lea J. Marks ("Marks"). The Feldmans attended a showing of "Dirty Money" in a Miami movie theater, and were not pleased with the exposure the movie received. Donald suspected Marks of failing to protect the interests of the Cambridge limited partners by not adequately promoting and overseeing the distribution of "Dirty Money," and he wrote to her protesting this failure.

In May 1975, the Feldmans invested in the Berkeley Group, Ltd. ("Berkeley"), another partnership in which Marks served as general partner. Berkeley bought the distribution rights to "Swept Away," a movie produced in Italy in 1974, for $3,385,000, of which $3,234,000 took the form of a non-recourse note. The private placement memorandum soliciting investors for Berkeley acknowledged that the film would need to generate $9.4 million in distributor's theatrical gross receipts in order to pay off the note, and that eighty percent of these revenues would likely be earned in the first 180 months after release. "Swept Away" was relatively successful in the United States, but Donald felt that Marks was not adequately promoting the film. Donald and Abramson spent their own money to buy advertisements for the film while it showed in Miami. The film did not make money for the Berkeley partners; Marks was removed as general partner and the holder of the non-recourse note foreclosed and repossessed the rights to the film. On their 1975–1980 tax returns, the Feldmans claimed distributable losses from Berkeley of $135,331, $50,195, $10,528, $6,417, $3,671, and $2,896.

The Internal Revenue Service ("IRS") solicited from the Feldmans consents to extend

---

1. All section references are to the Internal Revenue Code ("IRC") in effect for the years in question.

the statute of limitations for the tax years at issue (1974–1980). During the period these consents were in effect, the IRS Appeals Division had numerous contacts with the Feldmans or their representatives and offered to settle the case by allowing the Feldmans to claim the cash they invested in Berkeley and by waiving the penalties. The Feldmans did not accept this offer. Nor did the Feldmans ever terminate their consents by filing a Form 872–T for any of the years at issue. On April 2, 1987, the IRS issued a notice of deficiency disallowing many of the Feldmans' deductions, including those attributable to the Essex, Cambridge, and Berkeley partnerships during the 1974–1980 period.

On June 29, 1987, the Feldmans filed a petition in the Tax Court challenging the notice of deficiency. The Commissioner moved for partial summary judgment on the basis that the Tax Court's decision in *Abramson* [2] precluded the Feldmans from asserting the validity of the Berkeley investment. The Tax Court denied this motion and in the same opinion, denied the Feldmans' cross-motions for summary judgment which claimed that the consents to extend the statute of limitations expired because the notices of deficiency had not been issued within a "reasonable" time and that it would be unconstitutional to impose penalty interest under I.R.C. § 6621(c).

The Tax Court conducted a trial on May 15–17, 1991. Donald testified about his attempts to investigate and promote the Cambridge and Berkeley investments, the circumstances leading to the signing of the consents to extend the statute of limitations, and his wife's involvement in these matters. Patricia also testified regarding her involvement in these ventures. IRS Assistant District Counsel Sheldon Kay testified concerning the handling of the Feldmans' case and discovery matters. IRS Appeals Officers James Hinely and James Long testified as to the efforts to settle the case administratively within the Appeals Division.

On January 14, 1993, the Tax Court issued an opinion upholding the deficiencies and upholding penalty interest under I.R.C. § 6621(c) and a late filing penalty for the year 1975 under I.R.C. § 6651(a)(1). The Tax Court found that the Feldmans failed to prove that their investments in Essex, Cambridge, and Berkeley had economic substance or business purpose. *See Rice's Toyota World, Inc. v. CIR,* 752 F.2d 89 (4th Cir. 1985). In regard to Essex, the court noted that the Feldmans' evidence did not even establish the identity of the general partner or general partners, let alone their profit motivation. For Cambridge, the court found that the Feldmans failed to prove that the partnership ever acquired the rights to "Dirty Money," or that the partnership assumed any financial obligations regarding it. In fact, the evidence produced by the Feldmans, especially a letter from the distributor and a letter from Donald to the general partner, tended to show that the film's profit potential was dismal and that the Feldmans were anxious about their investment. For Berkeley, the court outlined the efforts made by Donald and Abramson to promote "Swept Away," but found that only the general partner's motive was relevant and that the Berkeley general partner lacked a profit motive. *See Brannen v. Commissioner,* 722 F.2d 695 (11th Cir.1984).

The Tax Court also found that the Feldmans' consents to extend the statute of limitations were valid because they showed no misrepresentation or misconduct and because the IRS had in fact made a settlement offer to them, even though they did not accept it. The court upheld the increased interest under I.R.C. § 6621(c), finding that all of the investments were "tax motivated transactions" within the meaning of that provision. The court denied Patricia Feldman's claim of innocent spouse relief because she was a partner of Berkeley and the deduction was

---

**2.** The Commissioner issued a notice of deficiency to Abramson disallowing the deductions he took based on his investments in Cambridge and Berkeley. Abramson filed a petition in Tax Court contesting the deficiency and the court conducted a trial. Donald Feldman testified at the trial although he was not a party. The Tax Court issued an opinion and decision upholding Abramson's deficiencies in 1987. *Abramson v. Commissioner,* 53 T.C.M. (CCH) 985, 1987 WL 40335 (1987).

therefore "attributable to" both spouses under I.R.C. § 6013(e)(1)(B). As to the Cambridge and Essex deductions, the court held that the evidence was too sparse to sustain Patricia's burden of proving that these investments were "grossly erroneous" when made. The Tax Court denied the Feldmans' motions to vacate its decision. This appeal followed.

## II. DISCUSSION

■■■ We review the Tax Court's fact findings for clear error. *Blohm v. CIR,* 994 F.2d 1542, 1548 (11th Cir.1993); *Atlanta Athletic Club v. Commissioner,* 980 F.2d 1409, 1411 (11th Cir.1993). The Tax Court's rulings on the interpretation and application of the statute are conclusions of law which we review *de novo. Blohm,* 994 F.2d at 1548. Ordinarily, the Commissioner's determination of tax liability is presumed correct. *Id. See also Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). The taxpayer, therefore, bears the burden of proving the determination erroneous or arbitrary. *Welch,* 290 U.S. at 115, 54 S.Ct. at 9.

A. Consents to extend the statute of limitations

The Feldmans signed waivers extending the statutory limitations period for each of the tax years at issue, 1974–1980. They contend no mutual assent existed at the inception of the communication regarding the waivers and that the waivers were procured by fraud or misrepresentation. Specifically, they argue that the IRS represented to them that if they signed the waivers, "meaningful" settlement negotiations would occur, but that the IRS never intended such negotiations because it had already arrived at an inflexible settlement position for all of the participants in the tax shelters at issue. The Feldmans also argue that the IRS solicited the extensions in order to litigate the easier cases first, thereby providing favorable precedent to use in the Feldmans' case.

The IRC generally provides that the statute of limitations for assessing a tax deficiency expires three years after the filing of the relevant return. I.R.C. § 6501(a), (b)(1). The Code also provides that a taxpayer and the government may consent to extend the statute of limitations:

*Extension by agreement.*—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

26 U.S.C. § 6501(c)(4). Pursuant to this statutory authority, the Commissioner developed Forms 872 and 872–A, which the Feldmans signed to extend the statute of limitations.

■■■ A consent to extend the statute of limitations under section 6501 "is essentially a voluntary, unilateral waiver of a defense by the taxpayer," not a contract. *Stange v. United States,* 282 U.S. 270, 276, 51 S.Ct. 145, 147, 75 L.Ed. 335 (1931); *Kronish v. Commissioner,* 90 T.C. 684, 693, 1988 WL 31959 (1988). However, because the statute requires that both the taxpayer and the Commissioner "consent in writing" to the extension, contract principles are useful in assessing mutual assent. *Kronish,* 90 T.C. at 693, 1988 WL 31959; *Piarulle v. Commissioner,* 80 T.C. 1035, 1042, 1983 WL 14837 (1983). When a taxpayer raises the affirmative defense of the statute of limitations, the taxpayer bears the burden to prove that defense. *Adler v. Commissioner,* 85 T.C. 535, 540, 1985 WL 15397 (1985). Once the taxpayer shows that the assessment occurred outside of the statutory period, the burden shifts to the Commissioner to show the existence of consent to extend the statute. *Haskell v. Commissioner,* 52 T.C.M. (CCH) 15, 18, 1986 WL 21545 (1986). If the Commissioner makes that showing, the burden shifts back to the taxpayer to prove that the waiver was invalid. *Id.; Adler,* 85 T.C. at 540, 1985 WL 15397. The ultimate burden of proof on the limitations defense always rests on the taxpayer. *Adler,* 85 T.C. at 540, 1985 WL 15397.

The Feldmans rely upon *Borg–Warner Corp. v. Commissioner,* 660 F.2d 324 (7th Cir.1981), to assert that the executed waivers were ineffective because no settlement negotiations were possible at the date of execution and thus no mutual assent was present. In particular, the Feldmans rely on the following excerpt from *Borg–Warner:*

> The purpose of agreements extending the statutory limitations period is to allow a taxpayer to seek compromises of its asserted tax liability. *See United States v. Herman,* 186 F.Supp. 98 (E.D.N.Y.1960). When the possibilities of settlement have been exhausted, the quid pro quo for the extension of this limitations period disappears.

*Id.* at 328.

Therefore, the Feldmans contend that if the quid pro quo is lacking at the inception of an agreement, there can be no valid agreement. Furthermore, absent an agreement, there can be no waiver because there is no mutual assent.

In *Borg–Warner,* the taxpayer executed a form 872–A on July 18, 1974. The agreement specifically provided in part that it could be terminated on "mailing by the Internal Revenue Service of written notification to the taxpayer(s) of termination of Appellate Division consideration...." *Id.* at 325. Following discussions with the taxpayer's representatives, one of the Appellate Division conferees wrote to inform the taxpayer's representatives that no mutually satisfactory basis for closing the case had been reached and that they intended to recommend issuance of a notice of deficiency. *Id.* at 326. The court determined that the letter from the Appellate Division constituted notification of termination.

The Feldmans' reliance on *Borg–Warner* is misplaced. Unlike the situation in *Borg–Warner,* the process of termination is unambiguously stated in Form 872–A, which provides that except for the mailing of a notice of deficiency, written notification by the Service to the taxpayer of termination of Service consideration can only be made using Form 872–T. Therefore, the Feldmans' consents did not terminate until the mailing of the notice of deficiency. Further, the issue in *Borg–Warner* was not whether the agreed extension of the statute of limitations was valid, but whether the letter from the Appellate Division was sufficient notification of termination. The issue here is whether the consent was invalid from its inception. At the hearing, two IRS appeals officers testified that they followed normal procedures in handling the Feldmans' case; they offered the Feldmans the standard settlement formulated for the type of tax shelter in which they were engaged and the IRS would have considered a variation on that standard settlement had the Feldmans given the IRS any basis for such a variation.

The record demonstrates that the Feldmans' case was assigned to appeals officers and that these officers held discussions with and sent correspondence to the Feldmans and their representatives. The appeals officers testified that the IRS reached a general settlement position for each of the tax shelters but the Feldmans declined the settlement. This offer would have allowed the Feldmans to deduct the cash they invested at the outset and would have waived any penalties. The officers also testified they would have given the Feldmans individual consideration and would have made adjustments to the general settlement positions had the Feldmans presented facts justifying such adjustments. At the time the Feldmans signed the waivers they were in a better position than the IRS to know whether their situation was different from that of other taxpayers in the same tax shelters.

The Feldmans also argue that the IRS deliberately deferred their case in order to gain a tactical advantage. The Feldmans contend that their case was more viable because they could show that Donald, unlike most of the partners in the tax shelters, tried to promote his investment and increase its profit potential by spending his own money to promote the films, making his own inquiries, sending complaints and suggestions to the general partners, and similar activities. The Feldmans argue that the consents made it possible for the IRS to defer litigation of their case until after this court issued its opinion in *Brannen v. Commissioner,* 722 F.2d 695 (11th Cir.1984), which held that

profit motive is to be tested at the partnership level. This argument is meritless. *Brannen* cites several cases holding that profit motive is to be tested at the partnership level. It cites no precedent to the contrary. Moreover, the *Brannen* decision was issued on January 9, 1984; the Feldmans signed the last of the Forms 872–A at issue on July 31, 1984, and August 2, 1984. Donald, an attorney, could easily have discovered *Brannen* and assessed its impact on his case. Additionally, the IRS officials testified that they did not deliberately "slow down" the Feldmans' case. The Tax Court found this testimony credible, and there is no indication that this finding is clearly erroneous.

Lastly, the Feldmans argue that the government is estopped from using the Feldmans' consents to extend the statute of limitations. We find no merit to this argument. The Supreme Court recently reaffirmed that equitable estoppel will lie against the government only in the most extreme circumstances. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). *See also Heckler v. Community Health Serv.*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (equitable estoppel will not lie against the government as against private litigants). This court also emphasized that while it is unclear precisely when the government may be equitably estopped, the burden on the private party seeking to estop the government is heavy, and that party must, at a minimum, demonstrate the traditional elements of estoppel. *Bokum v. Commissioner*, 992 F.2d 1136, 1141 (11th Cir.1993). "These elements are: (1) words, acts, conduct or acquiescence causing another to believe in the existence of a certain state of things; (2) wilfulness or negligence with regard to the acts, conduct or acquiescence; and (3) detrimental reliance by the other party upon the state of things so indicated." *Id.* (citations omitted).

█ The Feldmans failed to present any evidence of these elements. First, the IRS made no misrepresentation regarding the tax

shelter program or its application to the Feldmans. Second, in the absence of misrepresentation, there exists no negligence or wilfulness. Third, the Feldmans did not show that had they failed to sign the consents, the outcome of the litigation would have been more favorable to them. Finally, if we overturn the Feldmans' consents, they would receive an undeserved windfall. The Feldmans obtained the benefits of an extension: continued use of the disputed funds, an opportunity to explore whatever defenses were available, and a chance to see what happened to similar arguments in other cases. The Tax Court properly concluded that the Feldmans' consents were valid.

### B. Innocent spouse claim

█ The IRC provides that taxpayers who file joint returns become jointly and severally liable for any deficiency in tax arising out of the joint return. Relief may be granted, however, to an innocent spouse under the provisions of § 6013(e) which provides that where

(A) a joint return has been made under this section for a taxable year,

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

26 U.S.C. § 6013(e)(1).[3]

█ A taxpayer seeking relief as an innocent spouse has the burden of establish-

**3.** Subsection 6013(e) originally applied only to understatements of tax due to unreported income. In 1984, Congress amended the subsec-

tion so that it covered understatements due to erroneous deductions, credits, and basis. Tax Reform Act of 1984, Section 424(a), Pub.L. No.

ing that he or she comes within the exception provided by section 6013(e). *Bokum v. CIR*, 992 F.2d 1132, 1134 (11th Cir.1993); *Stevens v. Commissioner*, 872 F.2d 1499, 1504 (11th Cir.1989). The requirements of § 6013(e) are conjunctive. Therefore, a failure to meet any of the requirements will prevent a spouse from qualifying for relief. *Plank v. CIR*, 65 T.C.M. (CCH) 2798, 2800, 1993 WL 173792 (1993). The Tax Court found that Patricia did not meet her burden to establish that she was entitled to innocent spouse relief. We review this finding for clear error. *Guth v. CIR*, 897 F.2d 441, 443 (9th Cir. 1990).

At issue is subsection 6013(e)(1)(B), which requires that there be a "substantial understatement of tax attributable to grossly erroneous items of one spouse" in order to satisfy the innocent spouse exception. "Grossly erroneous items" are defined as any item of gross income attributable to such spouse which is omitted from gross income, and any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law. 26 U.S.C. § 6013(e)(2); *Bokum v. CIR*, 992 F.2d 1136, 1142 (11th Cir.1993); *Purcell v. Commissioner*, 826 F.2d 470 (6th Cir. 1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988).[4] Ordinarily, a deduction has no basis in law or fact if it is "fraudulent," "frivolous," "phony," or "groundless." *Bokum*, 992 F.2d at 1142 (citations omitted). *See also Flynn v. CIR*, 93 T.C. 355, 364, 1989 WL 107095 (1989) (a deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility).

In denying Patricia's claim of innocent spouse regarding the Cambridge and Essex investments, the Tax Court stated that although the court disallowed the losses claimed based upon the Feldmans' inability to prove a bona fide profit objective, the court could not say they had no basis in fact or in law. The Tax Court found that Patricia produced scant evidence concerning the actual activities and motives of the partnerships and the general partners. The Tax Court concluded that it did not follow that the deductions were grossly erroneous merely because Patricia failed to substantiate them on the record. With regard to the Berkeley investment, the Tax Court denied Patricia innocent spouse relief because the Schedule K–1's[5] issued by Berkeley for years 1977 and 1979 list the partners' names as "Donald and Patsy Jane Feldman." Thus, the understatement of tax was "attributable to" Patricia.

The Tax Court correctly found that Patricia failed to prove that the Cambridge and Essex deductions were grossly erroneous. The proof on this issue suffered from the same inadequacies that plagued the Feldmans' proof on the merits of the deductions for these partnerships. With regard to Essex, the Tax Court noted that the Feldmans failed to introduce any evidence on the business activities of the partnership, the profit motives of the general partner or partners, or even the identity of those partners. With regard to Cambridge, the Tax Court upheld the disallowance primarily because the evidence submitted by the Feldmans did not show the following: that the partnership ever acquired ownership of the movie "Dirty Money;" what the partnership's financial ob-

---

98–369, 98 Stat. 494, 801–02. This amendment is retroactive to all taxable years not barred by limitations to which the IRC of 1954 applies. H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1503, *reprinted in* 1984 U.S.Code Cong. & Admin.News 697, 1144. Thus, although Patricia Feldman's innocent spouse claim pertains to deductions claimed for the taxable years 1974–1978 and 1980, it may still be raised under the amended statute.

**4.** The "grossly erroneous" requirement must be evaluated at the time of the filing of the tax

return claiming the item. *Purcell*, 826 F.2d at 475. This is consistent with the purpose of the statute.

**5.** Schedule K is a summary schedule of all the partners' shares of the partnership's income, credits, deductions, etc. Schedule K–1 shows each partner's separate share. Schedule K is part of Form 1065 and is required to be completed by all partnerships including those with ten or fewer partners. Jacobs Mertens, Jr., *Mertens Law of Federal Income Taxation* § 47.33.

ligations were, if any; and that the general partner had any profit motive or engaged in any activity aimed at earning a profit.

■ The Feldmans argue that the Tax Court erred in concluding that the deductions were not grossly erroneous because it necessarily follows from the Tax Court's decision to uphold the imposition of the penalty interest rate of IRC § 6621(c) on the deductions that the deductions were grossly erroneous. However, "it does not follow that every deduction that is disallowed is necessarily 'groundless.'" *Bokum*, 992 F.2d at 1142. Section 6621(c) imposes an increased interest rate for certain deficiencies:

(1) *In general*—In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established under this subsection.

(2) *Substantial underpayment attributable to tax motivated transactions*—For purposes of this subsection, the term "substantial underpayment attributable to tax motivated transactions" means any underpayment of taxes imposed by subtitle A for any taxable year which is attributable to 1 or more tax motivated transactions if the amount of the underpayment for such year so attributable exceeds $1,000.

(3) *Tax motivated transactions*—

(A) In general: For purposes of this subsection, the term "tax motivated transaction" means—

\* \* \* \* \* \*

(v) any sham or fraudulent transaction.

26 U.S.C. § 6621(c) (repealed by Sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989, Pub.L. No. 101–239, 103 Stat. 2106, effective for returns the due date of which determined without regard to extensions, is after December 31, 1989).

■ The Tax Court disallowed the Feldmans' deductions for Cambridge and Essex because the Feldmans presented no evidence that the partnership had economic substance or a profit motive under IRC § 183. Such a basis for disallowance is one of the bases justifying imposition of increased interest un-

der former section 6621(c). *Karr v. Commissioner*, 924 F.2d 1018, 1026 (11th Cir. 1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 992, 117 L.Ed.2d 153 (1992). The Tax Court, however, imposed section 6621(c) interest rates because the Feldmans failed to substantiate a profit motive for the partnerships, not because it was able to find that no profit motive existed or that the lack of a profit motive was so apparent at the time taxpayers claimed the deductions as to make them "grossly erroneous."

■ When the Feldmans presented their case on the merits to the Tax Court, they attempted to convince the court that, whatever the failings of the general partners in Essex, Cambridge, and Berkeley, taxpayers themselves invested intending to make a profit and worked to insure they would profit. As the Tax Court observed in *Douglas v. Commissioner*, 86 T.C. 758, 1986 WL 22118 (1986), the fact that the Feldmans failed to establish this point because they were unable to substantiate it with records or other proof does not prove the contrary point, *i.e.*, that the partnerships did not exist to make a profit. *Id.* at 763, 1986 WL 22118. Thus, any holding to the contrary would violate the rule that a taxpayer cannot rely on mere disallowance of an item to prove that the item is "grossly erroneous." *Bokum*, 992 F.2d at 1142; *Douglas*, 86 T.C. at 763, 1986 WL 22118.

■ The Feldmans also contend that Patricia should not be denied innocent spouse relief as to the Berkeley investment just because she was listed as one of the partners. They contend Patricia was inactive in the partnership, unaware of most of its activities, and participated only on paper. The Feldmans presented insufficient evidence to prove the profit motive of the Berkeley partnership, but the evidence that they did produce shows that Patricia was aware of the investment and at least accompanied Donald in his alleged efforts to help the film show a profit. Knowledge or benefit is not the test for whether an item is "attributable to" an allegedly innocent spouse, however. *See* 26 U.S.C. § 6013(e)(1). The inquiry is a threshold one directed to establishing whether an

item on the return has a sufficient connection, through ownership rights or otherwise, to make it an item for which both spouses should bear responsibility. *Sturm v. Commissioner,* 65 T.C.M. (CCH) 2447, 2449, 1993 WL 118053 (1993) ("An understatement is not attributable to the spouse claiming innocent spouse status if he or she was not involved in the activity giving rise to the understatement.").

In *Elleven v. Commissioner,* 65 T.C.M. (CCH) 2313, 1993 WL 99976 (1993), the Tax Court found that deductions generated by an S Corporation were attributable to both a wife and a husband because they owned equal amounts of stock in the corporation and because they both participated in the corporation's activities. In the present case, the taxpayers owned an equal interest in the Berkeley partnership, and Donald's own testimony established that Patricia accompanied him in some of his efforts to investigate the progress of the investment. *Cf. Hillman v. Commissioner,* 65 T.C.M. (CCH) 2342, ——, 1993 WL 101364 (1993) (tax court determined that spouse was entitled to relief from liability in part because no documents or record indicated that the investments of the couple were titled in their joint names). Additionally, Patricia, as partner in Berkeley, had certain rights that would justify finding that the partnership items were "attributable to" her. If Berkeley made a profit, Patricia would have reaped the benefits. The Tax Court did not err in denying Patricia innocent spouse relief.

## III. CONCLUSION

We conclude that the Tax Court did not err in finding that the Feldmans were bound by their consents to extend the statute of limitations and that Patricia Feldman was not entitled to innocent spouse relief. We therefore affirm the judgment of the Tax Court.

AFFIRMED.