T.C. Memo. 1996-242

UNITED STATES TAX COURT

LOTA WOMACK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25258-93.                    Filed May 23, 1996.

<u>John S. Winkler</u>, for petitioner.

<u>Michael D. Zima</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARKER, <u>Judge</u>:  Respondent determined the following deficiencies in income taxes and accuracy-related penalties for petitioner Lota Womack and her husband, David H. Womack:

| Year | Deficiency | Penalty Under Sec. 6662(a) |
|------|-----------|-----------|
| 1989 | $1,886 | $377 |
| 1990 | 7,121 | 1,424 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The issue for decision is whether petitioner qualifies for relief as an innocent spouse under section 6013(e).

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner resided in Jacksonville, Florida, at the time she filed her petition.

Family Life

Petitioner married David H. Womack (Mr. Womack) on October 27, 1972, at the age of 18. Three children were born of this marriage: David S. Womack, born February 28, 1974; Lota Michelle Womack, born June 14, 1979; and Charles E. Womack, born April 4, 1986. During the years at issue, the Womack family lived in Jackson County, North Carolina, in the small town of Cashiers.

For approximately a week to 10 days in December of 1988, Mr. Womack was institutionalized in a mental hospital. He did not immediately return to the family residence upon release. Petitioner and Mr. Womack (the Womacks) lived apart from approximately December 3, 1988, through May 1, 1989. Petitioner and the children stayed in the family residence in Cashiers, North Carolina. On January 13, 1989, the Womacks entered into a

separation agreement. On or about May 1, 1989, they reconciled and began living together again in the family residence.

On or about September 19, 1992, petitioner and Mr. Womack again separated. The Womacks entered into another separation agreement on October 4, 1993 (the second separation agreement). By this time, petitioner had left North Carolina and was living in Florida. The second separation agreement placed the minor children in the primary custody of Mr. Womack, with summer and holiday vacations to be divided between the parents. Mr. Womack agreed to pay petitioner $300 per month in alimony. The Womacks were divorced on September 6, 1994. The divorce decree modified the separation agreement so that petitioner was given primary custody of their daughter.

Business Activities

Petitioner has a high school diploma. She worked as an uncertified dental assistant off and on from the time of her high school graduation until sometime in the early 1980's. In 1987 and 1988, petitioner assisted Mr. Womack in his equipment repair and rental business, a sole proprietorship known as Cashiers Repairs and Sales (the repair business). Her duties included waiting on customers, keeping daily records and receipts, and writing checks. The repair business had an office (the first office) at its shop.

Sometime in 1987 or 1988, Mr. Womack started a property services business known as Cashiers Property Services (the

property services business); the property services business was also conducted as a sole proprietorship. Cashiers is located in a resort area in the mountains of North Carolina. Many of the property services business's clients were people who owned vacation homes in the Cashiers area. The property services business opened and closed these vacation homes seasonally. The property services business painted buildings, winterized building exteriors, and performed landscaping and lawn care activities such as mowing lawns, planting trees and flowers, and raking leaves; it also picked up trash, paved roads, cleared lots, and provided transportation to the airport for its clients. Mr. Womack procured the clients, purchased the equipment and supplies needed, performed labor, and hired additional temporary laborers, if necessary, for his business.

For a few months Mr. Womack operated both businesses out of the first office. At some point prior to the years at issue, Mr. Womack phased out the repair business and closed the first office. From the closing of the first office until the Womacks' first separation, and for part of 1989, after their reconciliation, Mr. Womack conducted the property services business out of the family residence. Later in 1989, Mr. Womack rented office space for the property services business (the second office) from Debbie Stroup (Ms. Stroup). Mr. Womack closed the second office in September of 1992.

Mr. Womack never kept his own books. Petitioner kept the records and the checkbook for the repair business and the property services business up until the time of the Womacks' first separation. She took the books and records to an accountant to do the actual bookkeeping and to prepare the tax returns.

After Mr. Womack's hospitalization in December of 1988, his business declined precipitously to practically nothing. When Mr. Womack was released from the mental hospital, he found that petitioner had closed his business and personal bank account, that much of his business supplies and equipment had disappeared, and that his truck had been retitled in the name of petitioner's boyfriend. During the spring of 1989, Mr. Womack began reestablishing the property services business. At that time, Ms. Stroup began keeping the checkbook and the books and records for the property services business. However, Ms. Stroup did not prepare the tax returns; the accountant continued to prepare the returns. Mr. Womack would turn over his invoices and any receipts and other tax documents he had to Ms. Stroup. Mr. Womack was not consistent in keeping receipts for the supplies he purchased while working.

During 1989 and 1990, petitioner was aware that Mr. Womack was operating the property services business. Mr. Womack kept her informed of his whereabouts, and she knew some of his clients. Petitioner occasionally would go to his office on the

way to a family activity, or to get funds for household expenses from Mr. Womack or Ms. Stroup.  However, petitioner did not perform any services for the property services business in 1989 and 1990.

Petitioner began working as a secretary in January of 1989. She was employed on a full-time basis from May 1989 through 1990 by Interprop, Inc., as a secretary at a construction site.  She had no other job during this period.  Her wages were $12,803 in 1989 and $17,471 in 1990.[1]

Mr. Womack also worked as a baseball umpire.  The record does not show when Mr. Womack umpired, the amounts he was paid for umpiring, or when those amounts were paid.  It was Mr. Womack's recollection that most of the schools for which he umpired did not issue him a Form W-2 or 1099.  The Form W-2 for Mr. Womack attached to the 1990 return reflects wages of $1,000, but the name of the employer does not appear on this Form W-2.

Family Finances

During the Womacks' marriage, petitioner and Mr. Womack divided household expenses between them.  During 1989 and 1990, petitioner had a personal bank account at Brevard Federal Bank in

---

[1] The parties stipulated that petitioner's 1990 wages were $18,471; this is the amount on Line 7 of the Womacks' 1990 Federal income tax return.  However, after entering into this stipulation, respondent located the original copy of the 1990 return with two Forms W-2 attached.  One Form W-2 showed wages of $1,000 for Mr. Womack; the other, wages of $17,471 for petitioner.

Cashiers, North Carolina, into which she deposited her paychecks. Petitioner used funds from her personal account to pay household expenses such as groceries, day care, medical expenses and clothing for herself and the children, and gasoline. Mr. Womack paid the larger household expenses, including the mortgage, telephone, electricity, water, and trash bills, and the automobile insurance. As of January 1989, the Womacks' monthly mortgage payment was $945. On those occasions when petitioner was unable to cover her own or her children's expenses with her own funds, she would tell Mr. Womack what was needed, and he would supply her with the necessary funds.

Petitioner's net pay after withholdings for the years 1989 and 1990 was $10,606 and $14,528, respectively. The amount of cash petitioner withheld when depositing her paychecks totaled $2,444 in 1989, and $2,400 in 1990. During 1990, a total of $24,718 was deposited into petitioner's Brevard Federal account.

In 1989 and 1990, Mr. Womack received loans of $12,000 and $6,000, respectively, from petitioner's father. Petitioner was unaware of these loans. During 1990, Mr. Womack also received loans from Joe Stroup totaling $2,704. Other funds received by one or both of the Womacks during the years at issue were:

| Source | 1989 | 1990 |
|---|---|---|
| Veterans Administration | $5,486.00 | $5,486.00 |
| Sale of equipment | 20,000.00 | 2,500.00 |
| Mr. Womack's W-2 net pay | | 777.95 |

In 1989 or 1990, petitioner underwent surgery to remove some growths from her breasts and back. At the same time, she received breast implants. Petitioner's medical insurance would not cover the cost of the breast implants. Mr. Womack paid most, if not all, of the expenses for the implants; his contribution did not exceed $5,000.

Mr. Womack purchased several items of jewelry for petitioner during the years at issue. He bought her a diamond wristwatch, a diamond anniversary ring, at least one bracelet,[2] and a matching necklace and earring set. Petitioner also traded in a wedding band for a larger one. These purchases were made at Zales Jewelers in Charlotte, North Carolina, and through television shopping; some items were purchased on credit. Mr. Womack stopped making payments on the jewelry in September of 1992, after the Womacks separated. The record does not indicate whether or not the balance for the jewelry was ever paid.[3]

Neither petitioner nor Mr. Womack purchased any real property between 1989 and 1991, inclusive.

Tax Returns

_____

[2] Mr. Womack described a diamond tennis bracelet he purchased for her. Petitioner described a small gold link bracelet with a few topaz stones that he purchased for her.

[3] Mr. Womack estimated the cost of his jewelry purchases for petitioner at $6,000 to $7,000; petitioner estimated such purchases at $2,000 to $2,100. Apparently there was only one item for which Mr. Womack did not make full payment.

During their marriage, the Womacks used a tax return preparer to complete their returns. Petitioner and Mr. Womack filed joint Federal income tax returns for 1989 and 1990; those returns were prepared by Robert C. Wade, an accountant. The returns as filed reflect, among others, the following pertinent items:

| Item | 1989 | 1990 |
|------|------|------|
| Form 1040: | | |
| Wages | $12,803 | $18,471 |
| Business income (loss) | (7,118) | (735) |
| Adjusted gross income | 5,736 | 18,353 |
| Child care credit | --- | --- |
| Self-employment tax | 0 | 0 |
| Total tax on return | 0 | 0 |
| Earned income credit | 796 | --- |
| Schedule A:[1] | | |
| Medical expenses | --- | 4,276 |
| Mortgage interest | 9,048 | 7,541 |
| Personal interest paid | 2,356 | 769 |
| Charitable contributions | 500 | 1,200 |

[1] These amounts reflect the amounts reported as paid, not necessarily the amounts taken as deductions.

The Schedules C attached to the Womacks' 1989 and 1990 tax returns reflect the following items:

| Item | 1989 | 1990 |
|------|------|------|
| Gross receipts or sales | $33,774 | $220,582 |
| Cost of goods sold | 19,613 | 126,539 |
| Gross income | 14,161 | 94,043 |
| Expenses (including depreciation) | 21,279 | 94,778 |
| Net profit (loss) | ($7,118) | ($735) |

The cost of goods sold items are identified on the Schedules C as follows:

| Item | 1989 | 1990 |
|------|------|------|
| Purchases | $10,760 | --- |
| Subcontract labor | 8,853 | --- |
| Cost of labor | --- | $ 53,300 |
| Materials and supplies | --- | 73,239 |
| TOTALS | $19,613 | $126,539 |

In general, Mr. Womack's customers or clients paid him for services rendered, principally lawn care services, rather than for purchases of goods. The record does not indicate that Mr. Womack's property services business maintained any inventories of goods or that Mr. Womack sold any goods to his customers, although he may have made some incidental purchases of trees, flowers, or grass seed that he planted. Mr. Womack also made purchases of paints, lawn mowers, rakes, and other tools and supplies that he and his laborers used in the property services business. Mr. Womack made purchases of depreciable property for use in the business in the amounts of $32,313 in 1989 and $87,047 in 1990. Depreciation deductions were claimed in the amounts of $6,338 and $29,795, respectively, for those years.

Petitioner did not review the 1989 return before signing it, nor did she question Mr. Womack about it. She assumed it had been prepared by a capable accountant. Petitioner does not remember signing the 1990 return but did give Mr. Womack her 1990

Form W-2 as she had done in each previous year of their marriage. No separate return was filed by petitioner for 1990.

Examination of Returns

Respondent examined the 1989 and 1990 returns and, on September 9, 1993, mailed a separate notice of deficiency to each of the spouses who were at that time again separated and in the process of divorcing. Respondent determined the following increases (decreases) in income:

| Item | 1989 | 1990 |
|------|------|------|
| Income | $15,982 | $10,263 |
| Business expenses | 3,329 | 23,853 |
| Depreciation | (3,822) | (5,755) |
| Early withdrawal penalty | (311) | |
| Self-employment tax deduction | | (1,952) |
| Itemized deductions | | 1,981 |
| TOTAL | $15,178 | $28,390 |

Respondent used the bank deposits method to determine unreported income. In determining the omitted income of $15,982 and $10,263, respondent took into account petitioner's W-2 wage income, Mr. Womack's W-2 wage income, the loans from petitioner's father and Joe Stroup, and the miscellaneous income items discussed above; the omitted income was in addition to all of those known sources.

The parties have stipulated that the Commissioner "has accepted an aggregate amount of Schedule C expenses and cost of goods sold and/or operations paid by David Womack" for the property services business in the amount of $31,225 for the year

1989 and $167,669 for the year 1990.[4]  Actually the notice of
deficiency listed all of the deduction categories, including the
labor and materials (purchases) items described on the returns as
cost of goods sold, simply as Schedule C expenses.  For 1989
respondent reduced purchases from $10,760 to $8,420 and reduced
subcontract labor from $8,853 to $7,706.  For 1990 respondent
increased cost of labor from $53,300 to $67,388 and reduced
materials and supplies from $73,239 to $34,344.

Of the 13 categories of Schedule C expenses (not including
depreciation) reported in 1989, respondent reduced the allowable
expenses in six categories by a total of $7,514 and increased
four categories by a total of $4,185, for a net reduction of
$3,329.  Of the 18 categories of Schedule C expenses (not
including depreciation) for 1990, respondent decreased eight
categories by a total of $52,557 and increased six categories by
a total of $28,704, for a net reduction of $23,853.  Respondent
also identified $3,063 of personal expenses for insurance and

---

[4] The Court does not read this as a stipulation that Mr.
Womack's property services business in fact involved cost of
goods sold.  See Velinsky v. Commissioner, T.C. Memo. 1996-180,
where on the facts of that case the Court concluded that there
was indeed cost of goods sold.  On the record in the present
case, the Court concludes that the income of the business is
derived from performance of services, principally lawn care
services.  The record does not indicate that Mr. Womack
maintained any inventories or sold goods to customers or clients.
To the extent that the stipulation can be read as showing that
this case involves cost of goods sold, the Court will disregard
the stipulation as a legal conclusion unsupported by the factual
record.

utilities that had been included among the business expenses claimed for 1990 and disallowed by respondent. Respondent increased the depreciation deduction for both years and allowed a deduction for an early withdrawal penalty that the Womacks had not taken in 1989. In calculating the Womacks' tax liability, respondent allowed a child care credit of $133 and $378, for 1989 and 1990, respectively, credits that the Womacks had failed to take. Respondent computed self-employment tax of $1,090 and $3,903 for 1989 and 1990, respectively, and disallowed (recaptured) the earned income credit of $796 claimed for 1989.

Petitioner's adjusted gross income for 1992, according to the return she filed for that year, was $6,183. Her 1992 filing status was married, filing separately. Petitioner also filed a return for 1993.

Mr. Womack has not petitioned this Court or otherwise contested respondent's determinations as set forth in the notice of deficiency. Mr. Womack apparently has paid some $1,900 to $2,800 of the tax deficiency. He does not understand how the returns were prepared or respondent's determinations. The records that Mr. Womack gave to Ms. Stroup for the accountant to use in preparing the returns at issue were placed in storage in July of 1993, along with furniture, office equipment, and other of Mr. Womack's belongings. That occurred at the time the family residence was foreclosed on, when Mr. Womack and the three children had to move out of that house. In July of 1994, the

contents of the storage space were auctioned off when Mr. Womack was unable to make the rental payment on the storage space.

OPINION

Normally, spouses who have filed a joint return are jointly and severally liable for the tax due. Sec. 6013(d)(3). However, section 6013(e)(1) relieves a spouse of liability for the tax, including interest, penalties, and other amounts, attributable to the substantial understatement of tax of the other spouse, if the alleged innocent spouse meets the following requirements: (1) A joint Federal income tax return was filed; (2) there is a substantial understatement of tax attributable to grossly erroneous items of the other spouse; (3) in signing the return, the alleged innocent spouse did not know, and had no reason to know, of the substantial understatement; and (4) taking into account all the facts and circumstances, it would be inequitable to hold the alleged innocent spouse liable for the deficiency attributable to such substantial understatement.[5] Sec. 6013(e)(1).

---

[5] In addition, in order for a taxpayer to be eligible for relief, the liability arising from the above-described understatement of tax must exceed 10 percent of the taxpayer's preadjustment year adjusted gross income, where that adjusted gross income is $20,000 or less. Sec. 6013(e)(4)(A). The preadjustment year means the most recent taxable year of the taxpayer ending before the date the deficiency notice is mailed, here 1992. Sec. 6013(e)(4)(C). Section 6013(e)(4) does not apply to any liability attributable to the omission of an item from gross income. Sec. 6013(e)(4)(E). Here petitioner's preadjustment year adjusted gross income was $6,183, so any section 6013(e)(4) requirement is satisfied.

The taxpayer has the burden of proving that he or she meets each of these requirements. Feldman v. Commissioner, 20 F.3d 1128, 1134-1135 (11th Cir. 1994), affg. T.C. Memo. 1993-17; Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63. A failure to prove any one of these requirements will prevent the taxpayer from qualifying for relief. Feldman v. Commissioner, supra; Stevens v. Commissioner; supra; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993).

The parties now agree that petitioner filed joint returns with Mr. Womack for 1989 and 1990.[6] We now consider the other requirements for innocent spouse relief.

Substantial Understatement Attributable to Grossly Erroneous Items of the Other Spouse

Items Attributable to Mr. Womack

The deficiencies in this case stem from unreported income and disallowed Schedule C expenses. The remaining items in the notice of deficiency either decrease income or, being computational in nature, derive from the above adjustments. The

---

[6] At the calendar call, petitioner filed a motion to dismiss as to taxable year 1990 for lack of jurisdiction or, in the alternative, for leave to file amended petition. In support of this motion, petitioner alleged that petitioner's signature on the 1990 return was forged and that, therefore, the 1990 return was not a joint return. The Court denied the motion for dismissal and granted the motion for leave to file an amended petition to include this alternative. Petitioner has now abandoned this alternative position, acknowledging in her opening brief that the parties agree that joint returns were filed in 1989 and 1990.

parties agree that the disallowed Schedule C expenses relate to Mr. Womack's property services business.  They do not agree as to the attribution of the unreported income.  Petitioner had no income other than income from her secretarial job during the years at issue, and all of her W-2 wage income was reported on the tax returns.  We find that the source of the unreported income was an item attributable to Mr. Womack.

### Grossly Erroneous Items

"Grossly erroneous items" means any item of gross income attributable to a spouse which is omitted from gross income and any claim of a deduction, credit, or basis by a spouse in an amount for which there is no basis in fact or law.  Sec. 6013(e)(2).  An overstatement of cost of goods sold also results in an item omitted from gross income and hence constitutes a grossly erroneous item as a matter of law.  Lilly v. Internal Revenue Service, 76 F.3d 568 (4th Cir. 1996); Metra Chem Corp. v. Commissioner, 88 T.C. 564, 660-661 (1987); Velinsky v. Commissioner, T.C. Memo. 1996-180; Lawson v. Commissioner, T.C. Memo. 1994-286; LaBelle v. Commissioner, T.C. Memo 1984-69.

A deduction has no basis in law or fact if it is fraudulent, frivolous, phony, or groundless.  Feldman v. Commissioner, 20 F.3d  at 1135; Douglas v. Commissioner, 86 T.C. 758, 763 (1986).  A taxpayer cannot rely on the disallowance of an item to prove the lack of basis in fact or law.  Feldman v. Commissioner, 20 F.3d at 1136; Bokum v. Commissioner, 992 F.2d 1132, 1142 (11th

Cir. 1993), affg. 94 T.C. 126 (1990); Douglas v. Commissioner, supra.

In the instant case, the unreported income is by definition grossly erroneous. It is not clear whether petitioner is arguing that there was an overstatement of cost of goods sold in this case. In any event, on the record in this case, it appears that Mr. Womack was in the business of rendering services, primarily lawn care services for vacation-home owners. The Court cannot find that Mr. Womack maintained inventories of goods or manufactured, produced, or purchased goods for resale. Secs. 1.61-3(a), 1.162-1(a), Income Tax Regs. The Court cannot find that Mr. Womack's property services business involved cost of goods sold. Compare LaBelle v. Commissioner, supra, that involved an automobile dealership and Velinsky v. Commissioner, supra, that involved the production of a music video for a customer.

In order for the disallowed business expenses to be grossly erroneous items, petitioner must demonstrate that those expenses had no basis in fact or in law. Mr. Womack possessed no understanding of the preparation of the tax returns. Petitioner did not call Ms. Stroup, Mr. Wade, or respondent's revenue agent to testify. Petitioner has presented no proof that any of the disallowed expenses were not incurred; i.e., had no basis in fact.

The notice of deficiency states that $3,063 of personal expenses were disallowed for 1990.  Other than this, petitioner has presented no proof that any of the disallowed expenses lacked a legal basis.  We hold that $3,063 of the disallowed expenses for 1990 were grossly erroneous.  The grossly erroneous items attributable to Mr. Womack thus consist of the unreported income and $3,063 of the disallowed business expenses.

### Substantial Understatement

A substantial understatement is one that exceeds $500.  Sec. 6013(e)(3).  The amounts of the understatements related to the grossly erroneous items of Mr. Womack for 1989 and 1990, respectively, each exceed $500 and, therefore, are substantial.

### Knowledge of the Understatement

A taxpayer seeking innocent spouse relief must establish that he or she in signing the return did not know, and had no reason to know, that there was a substantial understatement of tax.  Sec. 6013(e)(1)(C).  A spouse has reason to know if a reasonably prudent taxpayer under the taxpayer's circumstances at the time of signing the return could be expected to know the return was erroneous or that further investigation was warranted. Stevens v. Commissioner, 872 F.2d at 1505; Bokum v. Commissioner, 94 T.C. at 148.  The test establishes a duty of inquiry. Stevens v. Commissioner, supra.  If a spouse knows enough facts to be put on notice of the possibility of a substantial understatement, she

has a duty to inquire further.  Guth v. Commissioner, 897 F.2d 441, 444-445 (9th Cir. 1990), affg. T.C. Memo. 1987-522.

Factors to be considered in determining whether the spouse had reason to know are the alleged innocent spouse's level of education; the spouse's involvement in the family's business and financial affairs; the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living, and spending patterns; and the culpable spouse's evasiveness and deceit concerning the couple's finances.  Stevens v. Commissioner, 872 F.2d at 1505; Flynn v. Commissioner, 93 T.C. 355, 365-366 (1989).

Petitioner has a high school education.  She assisted Mr. Womack in keeping records for his businesses, but prior to the years in issue.  She did not have access to the business books or records for the taxable years 1989 or 1990.  She was responsible for paying routine family expenses, such as groceries, gas, and the children's expenses, but Mr. Womack paid the larger mortgage, utility, and insurance bills.  Petitioner and Mr. Womack operated in separate spheres financially, except that Mr. Womack provided funds to petitioner as needed to pay household and personal expenses.  Mr. Womack paid for petitioner's breast implants and bought her several gifts of jewelry during the years at issue.

Petitioner did not review the 1989 return and does not remember whether she herself signed the 1990 return.  This does not excuse her from responsibility for their contents.  The

Schedules A attached to the returns listed some of the Womacks' expenses. Petitioner knew how her paycheck was spent and that all of her paycheck was spent. Her net pay in 1990 was $14,528 but $24,718 was deposited into her Brevard Federal account. She knew that she received additional money from Mr. Womack to pay household expenses and other expenses for her and the children. Petitioner did not know about the loans from her father and did not establish that she knew of any other sources of funds available to Mr. Womack. Petitioner had a duty to inquire as to how Mr. Womack could pay their usual bills and afford the additional expenses of her surgery and jewelry, when he was reporting no net income from his business. Mr. Womack paid a monthly mortgage payment of $945 for a total of over $10,000 a year. We find that petitioner had reason to know of the understatements.

Inequity of Holding Petitioner Liable

To qualify for innocent spouse relief, the taxpayer must show that, given all the facts and circumstances, it would be inequitable to hold the taxpayer liable for the tax deficiency attributable to the substantial understatement of the other spouse. Sec. 6013(e)(1)(D). One factor to consider is whether the taxpayer seeking relief significantly benefited from the erroneous items of the other spouse. Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). Normal support is not a significant benefit. Id. at 678-679; Flynn v. Commissioner, 93

T.C. at 367; sec. 1.6013-5(b), Income Tax Regs.  Normal support is determined by the circumstances of the parties.  <u>Sanders v. United States</u>, 509 F.2d 162, 168 (5th Cir. 1975); <u>Estate of Krock v. Commissioner</u>, <u>supra</u> at 678-679; <u>Flynn v. Commissioner</u>, <u>supra</u> at 367.

Another factor to consider is whether the spouse seeking relief had been deserted by, or divorced or separated from, the culpable spouse.  Sec. 1.6013-5(b), Income Tax Regs.  Yet, this is only one of the factors to be considered, and section 6013(e) relief is not limited to spouses whose marriage has ended.  <u>Mysse v. Commissioner</u>, 57 T.C. 680, 700 (1972).  A third factor is whether probable future hardships would be visited upon the innocent spouse if she is not relieved of liability.  <u>Sanders v. United States</u>, 509 F.2d at 171 n.16.

Petitioner received the gifts of jewelry, and Mr. Womack provided the funds for her breast implants.  Petitioner has not shown that these expenditures were normal support.  Neither has petitioner shown this liability would pose a hardship to her.  We hold that it would not be inequitable to hold petitioner liable.

In keeping with the above,

<u>Decision will be entered</u>

<u>for respondent.</u>
